**Robert Larry ADAMS, Appellant,**

v.

**Melvin R. LAIRD, Secretary of Defense.**

**No. 22506.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 5, 1969.

Decided Dec. 12, 1969.
Certiorari Denied April 20, 1970.
See 90 S.Ct. 1360.

J. Skelly Wright, Circuit Judge, dissented.

Mr. William M. Barnard, Washington, D.C., with whom Mr. Ralph J. Temple, Washington, D.C., was on the brief, for appellant.

Mr. H. Yale Gutnick, Atty., Department of Justice, with whom Asst. Atty. Gen. J. Walter Yeagley and Kevin T. Maroney, Atty., Department of Justice, were on the brief, for appellee.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

Appellant's complaint in the District Court sought declaratory and injunctive relief requiring the Secretary of Defense to accord to appellant certain security authorizations for access to classified information alleged by appellant to be essential to his continued employment by private companies engaged in defense work. Each side moved for summary judgment, and this appeal is from the District Court's order, entered without a statement of reasons, granting appellee's motion. We affirm.

I

This case grows out of the Federal Government's program to protect the integrity, while in the possession of private industry, of classified information relating to the national defense. That program was reorganized and established on new foundations in 1960 as a consequence of the Supreme Court's inability to find in it adequate procedural protections for the individual seeking or holding security clearance. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). The basic charter of the revised program is Executive Order 10865, issued by the President on February 20, 1960. 25 Fed.Reg. 1583. It directs the Secretary of Defense, among others, to prescribe regulations for the safeguarding of classified information within industry. It admonishes that an authorization for access to such information may be given "only upon a finding that it is clearly consistent with the national interest to do so." It prescribes a broad range of procedural rights for the individuals seeking or holding such authorization.

As directed, the Department of Defense issued on July 28, 1960, its Directive 5220.6, which embodies the Industrial Personnel Access Authorization Review Program. 25 Fed.Reg. 14399. DOD 5220.6 is a comprehensive document which states its policy to be the implementation of Executive Order 10865 by the taking of adequate measures "to insure that no person is granted, or is allowed to retain, an authorization for access to classified information unless the available information justifies a finding that such access authorization * * * is clearly consistent with the national interest." The organization for the administration of the program is spelled out in detail. A "Standard" for access authorization is defined in terms of a grant or continuation of access "only if it is determined that such access by the applicant is clearly consistent with the national interest." There are also enumerated several "Criteria" for the application of the Standard to individuals; and this particular section of the Directive is completed with a statement of several principles which are designated as "Guidance" for the application of the Standard and the Criteria. The first, and most central, of these principles asserts that the matters identified in the criteria

"may, in the light of all the surrounding circumstances, be the basis for denying or revoking an access authorization. The conduct varies in implication, degree of seriousness and significance depending upon all the factors in a particular case. Therefore, the ultimate determination of whether an

authorization should be granted or continued must be an over-all commonsense one on the basis of all the information which may properly be considered under this Regulation including but not restricted to such factors, when appropriate, as the following: the seriousness of the conduct, its implications, its recency, the motivations for it, the extent to which it was voluntary and undertaken with knowledge of the circumstances involved and, to the extent that it can be estimated and is appropriate in a particular case, the probability that it will continue in the future.

The remainder of DOD 5220.6 is largely devoted to a detailed prescription as to how cases are to be processed and the procedures which are to be observed. The adjudicatory hierarchy is comprised of a Screening Board, a Field Board, and the Central Industrial Personnel Access Authorization Board.

Appellant was employed in private industry as an electronics technician. In 1957, while employed by Melpar, Inc., appellant was given a *Secret* access authorization. In 1962 his then employer, National Scientific Laboratories, Inc., urged him to apply for a *Top Secret* authorization, which he did. This application went to the Screening Board for processing. The Board thought further investigation was necessary, and appellant was requested to present himself for an interview at the Potomac River Naval Command. Appellant appeared there at 9:00 A.M. on the morning of July 30, 1964, and was interviewed by two investigators from the Office of Naval Intelligence. They advised appellant at the outset of his right to refrain from answering questions, and that any answers he gave might be used against him. Appellant did not elect to stand mute, and the conversations began, continuing until four in the afternoon and being resumed for a short time on August 4. These discussions were mainly concerned with appellant's involvement in homosexuality, as to which he made a number of revelations.

Thereafter appellant's *Secret* authorization was suspended and his application for *Top Secret* denied. A "Statement of Reasons" was furnished to him at that time by the Screening Board, which, as set forth in the margin,[1] identified four of the Criteria as incompatible with certain homosexual conduct attributed to appellant. When appellant sought more particulars about this last, he was supplied, by a letter dated June 30, 1965, with a list of what were characterized as "further details." Appellant sent a let-

---

1. Criterion 16: Information available to the Screening Board indicates that you have engaged in criminal and immoral conduct and acts of sexual perversion and may continue to do so. This information is:

   a. On July 30, 1964, you acknowledged to several persons that you had engaged in numerous acts of sexual perversion, beginning when you were 14 years of age and continuing up to that date.

   b. In 1962, while you and [Mr. "X"] were working jointly on a local science fair project, you solicited the said ["X"] to engage in unlawful and immoral acts of sexual perversion.

   (Further details with respect to the matters alleged in this paragraph will be furnished to you upon your written request and will in any event be included in the record on which the determination in your case will be made.)

2. Criterion 14: The information set forth in paragraph 1, above, and the subparagraphs thereunder, reflects behavior, activities, and associations which tend to show that you are not reliable or trustworthy.

3. Criterion 17: The information set forth in paragraph 1, above, and the subparagraphs thereunder, reflects acts of a reckless, irresponsible, or wanton nature which indicate such poor judgment and instability as to suggest that you might disclose classified information to unauthorized persons, or otherwise assist such persons, whether deliberately or inadvertently, in activities inimical to the national interest.

4. Criterion 19: The information set forth in paragraph 1, above, and the subparagraphs thereunder, furnishes reason to believe that you may be subjected to coercion, influence, or pressure which may be likely to cause you to act contrary to the national interest.

ter by way of answer to these specifications, in which he admitted some of the acts but denied most of them, and ended by appearing to say that he perhaps made some admissions to his interviewers for the purpose of bringing the interrogation to an end.

Appellant asked for a hearing, which took place before the Field Board in Washington. Appellant was represented by counsel at this hearing, and testified on his own behalf. One of the ONI interviewers testified in person. Cross-examination of each witness took place. Each side was permitted to make documentary evidence part of the record.

The record so made, and the Field Board Examiner's report, went to the Central Board for review. Appellant was subsequently notified by letter, dated April 7, 1966, of a tentative adverse determination by the Central Board, a conclusion which appellant's counsel attacked in oral argument before the Central Board. That Board thereafter notified appellant of its final determination in these terms:

"After considering all of the information available to it, including—in addition to the items enumerated in letter of April 7, 1966—the argument presented at the appearance before the Central Board and the additional material submitted with your letter of June 9, 1966, the Central Board has determined that the granting of authorization to Mr. Adams for access to any information classified pursuant to Executive Order 10501 is not clearly consistent with the national interest. In reaching that determination, the Board found against Mr. Adams with respect to each allegation, paragraph

and Criterion of the Statement of Reasons furnished him under date of May 28, 1965. However, as pointed out in letter of April 7, 1966, the Board attributed no adverse significance to the matters detailed in subparagraphs a.(1), a.(2), a.(3), a.(7), and paragraph b. of letter of June 30, 1965 signed by Mr. Herbert Lewis of this Office. The Board concluded that its final determination and findings were adequately supported by, and the result of, its independent consideration of the evidence of record, excluding the matters immediately above-mentioned."

The matters to which the Board, in both its tentative and its final determinations, attributed no derogatory significance related to homosexual acts before appellant reached adulthood, frequenting a public restaurant said to be a hangout of homosexuals, and refraining during the ONI interview on self-incrimination grounds from answering any questions about sexual relationships since 1960 with Mr. "A", a fellow employee at Melpar, Inc. This left as the factual basis for the Board's inability to find that security clearances for appellant were in the national interest (1) homosexual acts engaged in with two fellow employees at Melpar, Inc., whom appellant would identify only as Messrs. "A" and "B", (2) a homosexual act with one "Y" in 1963, and (3) the solicitation of "X" in 1962, when they were working jointly on a science fair project, to engage in homosexual acts.*

## II

The record in the District Court was the administrative record compiled in the agency proceedings.[2] On this ap-

---

\* Reference throughout this opinion to Messrs. "X", "Y", and "Z" represent substitutions of these symbols for the real names stated in the record.

2. This would appear to be another of those cases where the interposition of the District Court in the judicial review process serves no visible purpose, especially where, as here, the District Court gives

no hint of the reasons why it disposed of the cross-motions for summary judgment as it did. We start at the same point as we do in the cases where Congress has made provision for direct review by the Courts of Appeals of federal agency action. This double review of the administrative record by two of the inferior federal courts has been commented upon by us adversely before. *See* Gold-

peal, appellant does not assert that the evidence in that record is inadequate to support the factual determinations as to appellant's conduct which were relied upon by appellee in denying the clearances. Appellant claims that that evidence was, in two respects, obtained or admitted under circumstances violative of due process of law, Executive Order 10865, or DOD 5220.6. Over and beyond these alleged procedural defects, appellant urges a failure of due process in that (1) the evidence was weighed under standards not articulated with the requisite degree of specificity, and (2) no findings or conclusions were made demonstrating that the clearance denials were, as he puts it, "required in the national interest."

## 1. The ONI Interview.

■ The record evidence of appellant's homosexual history was comprised in considerable part of memoranda and testimony as to what was said during the interview of appellant by the ONI agents on July 30 and August 4. Appellant now urges that this interview was so inherently coercive as to render unreliable the statements he made in the course thereof, and for the Board either to reach conclusions on such evidence or to countenance such coercion by entertaining that evidence is incompatible with the constitutional command of due process. The pivot of this argument is Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), although it is not claimed that the right to counsel during criminal custodial in-

vestigation recognized in that decision was violated here.[3] Rather, it is argued that the unseemly police interrogation practices adverted to by the Supreme Court in its opinion in Miranda were indulged in here, and should, accordingly, be made the basis for nullifying the use of any information developed during the interview.

In resolving this issue against appellant, we do not rest upon any distinction between criminal interrogation and that involved here for purposes of invoking the right against self-incrimination. Neither do we deny the relevance of Miranda because it, strictly viewed, turned upon the failure to provide counsel—a matter not in issue here. We look rather to what the record reveals for our measurement of whether what happened here was so patently uncivilized or grossly intimidating as to require judicial interference, in vindication of constitutional principles, with this execution by the Defense Department of its responsibilities under Executive Order 10865.

The decision by the Screening Board to seek an interview of appellant appears to have been largely the result of certain discrepancies on the face of his pending application for the Top Secret authorization. He was invited to present himself for interview, and he voluntarily did so. Upon his arrival at the ONI office at 9:00 A.M., he was greeted by two agents. It is conceded that they prefaced any questioning by advising him of his self-incrimination rights.[4] The first part of the interview

wasser v. Brown, 135 U.S.App.D.C. 222, n. 1, 417 F.2d 1169 n. 1 (1969); Scott v. Macy [II], 131 U.S.App.D.C. 93, 96 n. 6, 402 F.2d 644, 647 n. 6 (1968); Connelly v. Nitze, 130 U.S.App.D.C. 351, n. 1, 401 F.2d 416, 417 n. 1 (1968); see also Dabney v. Freeman, 123 U.S.App.D.C. 166, 358 F.2d 533 (1965). It seems appropriate for exploration in the first instance by the Judicial Review Committee of the Administrative Conference of the United States.

3. In Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Supreme Court restricted the backward

reach of Miranda to criminal trials commencing after June 13, 1966. Even if deemed applicable to the type of interrogation involved here, that interrogation took place in 1964 and the Field Board hearings had been completed prior to this cut-off date.

4. DOD 5220.6 provides that it is "essential" that applicants cooperate by giving full and accurate information in response to official inquires. See p. 239, infra. Elsewhere it prohibits the release outside the Executive Branch of information gained in these investigations.

was devoted to clearing up some errors in appellant's papers. It then turned to the subject of homosexuality.

The conversations on July 30 continued until four in the afternoon; this included a one-hour luncheon recess, two coffee breaks, and what appear to have been at least two comfort breaks. There is nothing in the record to suggest that appellant was in physical custody and, indeed, there are affirmative indications to the contrary. He left the building by himself to go to lunch, and was under no surveillance while he was away. He did not plead fatigue or other reason for terminating the interview, and, when it broke up at four o'clock, arrangements were made by mutual agreement for him to return to complete it five days later. He returned at the time agreed upon, and talked without protest to the agents for two more hours at that time. A telephone was available throughout for appellant's free and unrestricted use and, on the first day, he in fact used it to call his employer to say that he would be late getting back to work.

The conversation was about what one might expect such a dialogue to be. The agents were persistent, as professional investigators have a way of being. Appellant was obviously torn between distaste for revealing highly intimate details of his personal life, on the one hand, and, on the other, his desire not to endanger the success of his application by seeming to be uncooperative or to be concealing matters which inferentially might be regarded as much worse than they were in fact. His lot, in short, was an unhappy and uncomfortable one, as is true of anyone who occupies as ambivalent a position as does the homosexual in the contemporary social order. It was not, in our view, significantly worse than would normally obtain if it be thought that he was properly subject to questioning at all on this subject.

We do not doubt that his interrogators were aware of the conflicting pulls upon him, or that they reminded him of them with varying degrees of subtlety.

In doing so, they would in effect have been calling his attention to the following paragraph contained in the "Guidance" principles stated in DOD 5220.6 for the application of the Standard and the Criteria:

It is essential to the efficient, economical, and equitable operation not only of the Industrial Personnel Access Authorization Review Program, but of the total procedures whereby the Department of Defense authorizes access to classified information, that applicants provide full, frank and truthful answers when they complete official questionnaires or other similar documents, or respond to official inquiries. Accordingly, the deliberate giving of false or misleading testimony or information on relevant matters, may be sufficient standing alone to justify denying or revoking access authorization and shall be weighed carefully before a determination is reached under this Program.

The moment that appellant decided to press his application in the face of investigation and to submit himself for that purpose to interrogation, pressures upon him were inevitable. They included the distasteful business of answering the questions of two investigators who must have appeared to him at one time as potential allies in his quest for clearance, but who in the end proved to be instrumentalities of his frustration. Viewed by appellant in the one role, the conversations with them must have seemed quite different from how they came to appear after the fact. It is surely not surprising that what at the time appeared to be an opportunity to be seized later looked like a trap to be denounced.

We are not unsympathetic towards the highly subjective nature of appellant's feelings about the interrogation, but we do not find in the record anything so shocking about it as to transgress the limits of due process or to render wholly unreliable the statements attributed to appellant in the course of that interview.

## 2. *The "X" Affidavit.*

At the Field Board Hearing, the Government offered in evidence an affidavit, dated June 22, 1964, by one Mr. "X", a Duke University student. That affidavit related that "X" had known appellant for five or six years; some 2½ years before, appellant had helped "X" with a science fair project; and during those meetings appellant has asked "X" to engage in homosexual acts with him, representing to "X" that he (appellant) was an active homosexual and recounting to "X" appellant's past and current homosexual experiences. Appellant now urges that the lack of opportunity afforded him to confront and to cross-examine "X" was a denial of due process under the Constitution, as well as a departure from the requirements of Executive Order 10865 and the regulations issued by appellee thereunder.

Executive Order 10865 contemplates that a person situated as was appellant must be afforded an "opportunity to cross-examine persons either orally or through written interrogatories"; and the implementing language of DOD 5220.6 is that " * * * the record may contain no information adverse to the applicant on any controverted issue unless (1) the information or its substance has been made available to him and the applicant is afforded an opportunity to cross-examine the person providing the information either orally or by written interrogatories." The transcript of the Field Board hearing contains the following colloquy at the time the affidavit was offered:

MR. TILTON [for the Government]: * * * I have a sworn affidavit of [Mr. "X"] who has indicated his willingness to appear at the proceeding and testify * * * I have been in contact by telephone with him, and he is unable to appear.

He has indicated that he would reply to interrogatories. I have furnished a copy of the statement to Mr. Graves [attorney for appellant] and have indicated that I certainly would assure him of the right to submit cross-interrogatories. I offer a facsimile reproduction, and a copy of which I have furnished, as I say, to him.

MR. GRAVES: All right.

[Admission of Affidavit as Government's Exhibit No. 2]

MR. ROCHE [Field Board Examiner]: That [sic] has been extended to counsel for the applicant for [sic] an opportunity to submit interrogatories to Mr. ["X"] should he desire to do so?

MR. TILTON: By the same token, Mr. Chairman, Mr. Graves previously indicated that a prospective witness for the applicant, [Mr. "Z"], was unable to appear, and I have stipulated with him that he may submit an affidavit of Mr. ["Z"] subject to my right to submit cross interrogatories.

MR. GRAVES: * * * I would suggest * * * we have 15 days from the conclusion of this proceeding, both of us, for me to submit interrogatories to ["X"]—on the ["X"] statement, and also to submit the affidavit of Mr. ["Z"].

\* \* \* \* \* \*

MR. ROCHE: Each of you will have a like period to submit interrogatories should you so desire.

It thus appears that, far from objecting to the admission of the "X" affidavit or insisting that the affiant be produced for cross-examination, appellant was content to avail himself of the use of written interrogatories, as contemplated in the Executive Order and the regulations. We need not decide whether restriction to written interrogatories in lieu of direct confrontation would invariably comport with the demands of due process in those cases where the applicant objects to proceeding without cross-examination. But there was no such insistence here, due at least in part to the fact that appellant himself had a witness he wished to present through affidavit rather than in person, and was

accordingly ready to stipulate with government counsel that each would consent to admission of the other's evidence in the form of an affidavit, subject to the right of each to submit written interrogatories.[5]

In the light of the foregoing, the contention that the admission of the "X" affidavit was in conflict with the requirements of Executive Order 10865 and the regulations borders on the frivolous. Neither did the admission of the affidavit occur under circumstances amounting to an impingement upon the Due Process Clause standing alone. Appellant freely elected to agree to the admission of the affidavit and to rely upon written interrogatories for any testing of it that he chose to make. These are something less than the conditions of fundamental procedural unfairness which are the focus of the due process concept.[6]

3. *Standards and Findings.*

■ Appellant's final appeal to the Due Process Clause is formulated in terms of an asserted absence of (a) any adequately enunciated standard for evaluation of conduct disqualifying one for security clearance, and (b) findings showing a need for denial. Both of these claims take their departure from a substantive concept which appellant professes to derive from United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L. Ed.2d 508 (1965), and their weight largely turns upon the validity of this premise.

*Robel,* of course, did not involve the Industry Personnel Access Authorization Review Program. It was a criminal prosecution under the Subversive Activities Control Act of a Communist Party member for remaining in the employ of a defense plant after the Party had been found to be a Communist-action organization. The Supreme Court reversed the conviction on First Amendment grounds because, in its view, the statute swept too broadly and did not take into account such considerations as whether the individual's job was a sensitive one in terms of national security. The Court was, however, at some pains to recognize the power, and indeed the duty, of the national government to protect its secrets. It declared that "[t]he government can deny access to its secrets to those who would use such information to harm the Nation." Fastening upon the phrase "would use," appellant insists that security clearance may be withheld only when the government can "point to a clear and present danger that a breach of security is actually threatened," and that it is not enough that an applicant "may be subject to coercion, influence or pressure."

Thus what appellant seems really to be urging is not that there is presently no identifiable standard but that the standard followed is the wrong one. It is certainly clear that the President explicitly articulated a standard, and the Defense Department adopted it. That standard is, as stated above, that classified information is to be made accessible to an applicant "only upon a finding that it is clearly consistent with the national interest to do so." That is a significant variation from the standard proposed by appellant, namely, access is to be denied

---

5. The record shows that, in the event, only government counsel elected to avail himself of this stipulation, submitting an interrogatory which elicited an answer favorable to appellant. There is no indication of why counsel for appellant decided not to submit interrogatories to "X."

6. There is no intimation in Green v. McElroy, p. 232, *supra,* that the right to confrontation cannot be voluntarily relinquished where a party consciously deems it in his interest to do so. Appellant now asserts that his waiver was meaningless because the Board had no intention of honoring his right to have "X" present in person. There is, however, no basis in the record for this speculation. The record rather reflects a tactical decision by appellant to forego a cross-examination which, as it turned out, appellant concluded not to pursue even by the interrogatories for which he had bargained.

only if the government can demonstrate a clear and present danger that it will be misused.

We know of no constitutional requirement that the President must, in seeking to safeguard the integrity of classified information, provide that a security clearance must be granted unless it be affirmatively proven that the applicant "would use" it improperly. We are not in an area of knowledge or experience where absolutes obtain, and the grant or denial of security clearances is an inexact science at best. Those who have that responsibility have to do the best they can with what they have, and the discretionary determinations they must inevitably make are not, as a matter of due process at least, required to conform to any such alternative standard as appellant advances. Appellant is not being sent to jail; he is being told rather that, on the information developed and the facts found after hearing, appellee cannot make a finding that giving him access to secret information is "clearly consistent with the national interest."

The prescription of the standard to be observed in this field is for the President to make in the discharge of his executive functions. We do not second-guess that choice unless the Constitution commands us to do so. The one actually chosen in this instance falls, in our view, within the range of rational choice vested in the President by the constitutional concept of his office.

▮ Neither do we think that the standard here involved is lacking in a particularized enunciation adequate to satisfy due process elements of notice

and rationality. DOD 5220.6 sets forth many "Criteria," which include ample indications that a practicing homosexual may pose serious problems for the Defense Department in making the requisite finding for security clearance. They refer expressly to the factors of emotional instability and possible subjection to sinister pressures and influences which have traditionally been the lot of homosexuals living in what is, for better or worse, a society still strongly oriented towards heterosexuality.

It is true, as appellant argues, that the "Guidance" principles set out in DOD 5220.6 repose a wide range of discretion in the administering authorities. When determinations are left in the last analysis to "an over-all common-sense" view of the particular situation, predictability is perhaps at something of a premium. But we doubt that anyone in appellant's position would really want it otherwise, especially when that "common-sense" judgment is expressly directed to be informed by such factors as "the seriousness of the conduct, its implications, its recency, the motivations for it, the extent to which it was voluntary and undertaken with knowledge of the circumstances involved, and, to the extent that it can be estimated and is appropriate in a particular case, the probability that it will continue in the future." Surely this is, in terms of essential fairness, an approach to be preferred to that of making any history whatever of homosexuality a basis for withholding clearance, and one not to be faulted on due process grounds because it eschews the latter.[7]

---

7. Appellant complains of the possibilities of discriminatory treatment inherent in the application of a "common-sense" judgment, and points in this regard to an applicant who was granted a secret clearance despite the fact that he freely admitted several homosexual acts while in the Army during the Korean War. That applicant, however, also presented what apparently was thought to be credible testimony that he had lost his interest in homosexuality after discovering the de-

lights of heterosexuality. Appellant continues to be one who has been found, from adequate evidence in the hearing record, to be an adult practicing homosexual despite his denials that he is. The potential for personal instability and vulnerability to external pressure implicit in this duality is obviously substantial; it was, of course, one of the Criteria taken into account in appellant's case. *See* Note, Government-Created Employment Disabilities of the Homosexual, 82 Harv.

■■ Appellant's final invocation of due process is phrased as a complaint about the Board's failure to make findings. Again, however, the gravamen of this objection appears in essence to be not that the Board made no findings but, rather, that the ones it made were responsive to the wrong standard. The Board found as facts that appellant had, during his recent adult years and while employed in a defense plant, engaged in repeated homosexual acts, and during the same period had solicited a friend to participate with him in such activities, representing to that friend that he (appellant) was an active homosexual. The Board explicitly put aside and refused to take into account other circumstances either involving homosexual acts prior to adulthood, or not establishing acts, as distinct from inferences to be drawn from associations and a claim of self-incrimination.

On the basis of these factual determinations, the Board declared its inability to find that the granting of clearances to appellant was "clearly consistent with the national interest." It stated that these facts were relevant to the criteria specified in the Statement of Reasons originally furnished to appellant by the Screening Board. Those criteria included such factors as reason to believe from the facts found that appellant "may be subjected to coercion, influence, or pressure which may be likely to cause you to act contrary to the national interest,"

and that appellant is characterized by "such poor judgment and instability" as to suggest the vulnerability to disclosure of classified information in his possession.

The Central Board's adoption of these determinations are findings in the sense of being a concrete statement of identifiable reasons as to why the Board, on the record before it, decided as it did. We do not find them deficient in terms of procedural due process, as appellant would have us do; and, although appellant does not really urge upon us an abuse of discretion in any substantive sense,[8] we are unable to declare that, in this case and on this record, the denial of clearance to appellant reflects an operation of the industrial information program which transgresses upon the Constitution or falls outside Executive Order 10865 and the regulations implementing it.[9]

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

I concur in the majority's conclusion concerning the right of confrontation issue and the conduct of the interview. However, I would remand this case to the Central Board for a determination of the relationship between the alleged homosexual conduct and the ability of appellant to protect classified information. Therefore, I respectfully dissent.

L.Rev. 1738, 1749–1750 (1969) and Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161, No. 21625 (July 1, 1969), where we noted that "[B]ecause of the potential for blackmail [in homosexual conduct], it might jeopardize the security of classified communications."

8. Nor did appellant endeavor to make of the evidentiary hearing at the agency level a forum for the exploration of the relationship between the conduct with which he was charged and his capacity to protect classified information. The purposes to which he put that hearing was to prevent a finding that the conduct had occurred. This was a wholly legitimate approach on his part, but it hardly casts him in the role of the avowed but aggrieved homo-

sexual who insists that his qualifications to maintain security are no less than those of anyone else.

9. This is not a case where appellant is being denied the prospect of any kind of employment with the Federal Government. *Compare* Scott v. Macy (II), n. 2 *supra,* and Norton v. Macy, n. 7 *supra.* We deal here only with a particular discharge of the President's responsibility to protect the integrity of classified information which must, in the national interest, be placed in the hands of private industry. From the standpoint of the legitimate foundations for judicial intervention, the differences between the two situations are obvious.

Appellant held a *Secret* clearance during most of the time between 1957 and 1965. In 1962, five years after obtaining his first *Secret* clearance, he applied for a *Top Secret* clearance. No immediate action was taken on this application. After two more years, during which appellant continued to work on classified projects, he was called for an interview at the Office of Naval Intelligence. Through appellant's admissions at this interview, the Government learned that he was a homosexual. In spite of these disclosures, appellant's security clearance was not revoked—he continued to have access to secret documents—for an additional year. I can only conclude from this delay that not even the Defense Department was exercised about appellant as a security risk.

The Defense Department's lassitude was justified. Appellant was not a new and untested employee. From the record we must assume that he had not misused any classified information over a period of nearly eight years. But despite this record of reliability, the Board made no real effort to show why its factual findings relating to homosexuality precluded continued security clearance in this case *Compare* Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969). Generalized assumptions that all homosexuals are security risks [1] certainly cannot outweigh almost eight years of faithful service. Even before Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), it was firmly established that the due process clause of the Fifth Amendment encompasses the "right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference." [2] As a result of the Board's actions, appellant's ability to obtain employment in his profession is at least seriously impaired. I would conclude on this record that the action of the Central Board in withdrawing security clearance after eight years of reliable service did not comport with the requirements of due process. Assumptions predicated on appellant's unfortunate affliction unrelated to the facts of this case cannot provide a legal basis for effectively denying him access to his livelihood.

The Board does not explain why a finding that appellant had been involved in some isolated instances of homosexual conduct should lead to a conclusion that appellant had not shown himself fit to hold a security clearance. The only explanation is contained in a "statement of reasons" furnished to appellant when he lost his clearance. Those "reasons," however, did not explain the Board's actions. They were merely one-sentence recitations checked off from a list previously prepared for denying security clearances generally. There was no attempt to show how these stock conclusions had been drawn from the circumstances of this case. In fact, several of the enumerated "reasons" seem to bear little or no relationship to the facts of this case. For example, the Board denied the clearance partially because appellant's homosexual acts indicated that he was not "reliable or trustworthy." But no rational connection between isolated homosexual activity and reliability is demonstrated by *facts* as distinguished from unsupported assumptions. If the Board has any evidence indicating either that this appellant specifically, or that homosexuals taken as a group, are not trustworthy or reliable, it ought to include that evidence in this record.

The Board also stated that appellant's homosexual actions were so reckless that they indicate the kind of instability that would lead appellant to disclose classified information. Again, no relationship appears between the facts brought out at the hearings and the Board's finding. The conclusion is simply baldly stated as though no facts were necessary to support it, and the

---

1. *See* Note, Government-Created Employment Disabilities of the Homosexual, 82 Harv.L.Rev. 1738, 1749–1751 (1969).

2. Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959).

central, uncontested fact in this case—that in appellant's eight years of handling classified materials the Board has been unable to point to a single breach of security—is simply ignored.

The Board's finding that appellant might be subject to blackmail for his activities may well have some basis in common experience. However, appellant freely told his interrogators of his homosexual experiences and his supervisor of the charges against him. Certainly after the publicity surrounding this court suit, his alleged homosexuality is no longer a basis for blackmail, if indeed it ever was.

In sum, the clear impression left by reading the record in this case is that appellant was denied his clearance simply because of homosexual acts, without any effort to determine whether his status as a homosexual related to his abilities to protect classified information. The Board's ruling is in effect a bill of attainder against all homosexuals, at least insofar as obtaining security clearance is concerned.

In cases where national security is at stake, wide discretion must of course be accorded the determinations of the Board. However, there must in all cases be some rational relationship between the facts found and the actions of the Board. Without such relationship, it would be pointless to accord appellant any procedural rights. The burden on appellant to prove his entitlemement to *Top Secret* clearance, or even to continuing *Secret* clearance is great indeed.[3] The least he should be able to expect from the Board before it effectively takes away his right to earn his living

in his chosen profession is a decision in which there is a rational nexus between the facts and the conclusions drawn therefrom.

3. It is not altogether clear from the regulations that a person has the same burden in continuing his clearance as in obtaining clearance in the first instance. In either event, at least the applicant must be given a "written statement of the reasons why his access authorization may be denied or revoked, which shall be as comprehensive and detailed as the national security permits." Executive Order 10865, § 3(1), 25 Fed.Reg. 1583 (1960).

*See* Department of Defense Directive 5220.6, § IV(C) (5) (July 28, 1960), 25 Fed.Reg. 14396 (1960). This Executive Order clearly indicates, as required by Greene v. McElroy, *supra* Note 2, that the Board's written statement of reasons should contain facts, rather than unsupported assumptions, at least "as comprehensive and detailed as the national security permits."