490 F.2d 740
 160 U.S.App.D.C. 172
 Richard L. GAYER
v.
James R. SCHLESINGER, Secretary of Defense, et al., Appellants.
Otto H. ULRICH, Jr.
v.
James R. SCHLESINGER, Secretary of Defense, et al., Appellants.
Benning WENTWORTH
v.
James R. SCHLESINGER, Secretary of Defense, et al., Appellants.
 Nos. 71-1934, 71-1935, 72-1820.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Jan. 29, 1973.
Decided Nov. 15, 1973, Rehearing Denied Dec. 27, 1973, For
Order Amending Concurring Opinion, See 494 F.2d
1135.
 
 Garvin Lee Oliver, Atty., Dept. of Justice, with whom Robert L. Keuch, Atty., Dept. of Justice, was on the brief for appellants. Benjamin C. Flannagan, Atty., Dept. of Justice, also entered an appearance for appellants in Nos. 71-1934 and 71-1935.
 Dennis M. Flannery, Washington, D.C., with whom Melvin L. Wulf, New York City, and Ralph J. Temple, Washington, D.C., were on the brief for appellees.
 Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit judges.
 FAHY, Senior Circuit Judge:
 
 
 1
 These three appeals have been consolidated for hearing and disposition by this court. Each is an appeal by Defense Department officials from a judgment of the District Court setting aside action unfavorable to appellees which was taken by appellants under the Industrial Personnel Security Clearance Program of the Department of Defense. The program is administered by the Industrial Security Clearance Review Office (ISCRO) of the Department. In No. 72-1820, Wentworth v. Schlesinger et al., and No. 71-1935, Ulrich v. Schlesinger et al., we affirm on one of the grounds assigned by the District Court, without prejudice, however, to further proceedings respecting security clearance of appellees consistent with our opinions. In No. 71-1934, Gayer v. Schlesinger et al., we hold the case should be remanded to the administrative level to afford an opportunity to appellee, if so advised, to reopen the departmental proceedings as we shall explain, failing which the decision of the District Court setting aside the suspension of his security clearance shall be reversed.
 
 
 2
 No. 72-1820-- Wentworth v. Schlesinger, et al.
 
 
 3
 This case originated under an Executive Order of President Eisenhower promulgated February 24, 1960,[1] implemented by a Defense Department Directive of December 17, 1966.[2] The security clearance program thus established was considered by this court in Adams v. Laird, 136 U.S.App.D.C. 388, 420 F.2d 230 (1969), cert. denied, 397 U.S. 1039, 90 S.Ct. 1360, 25 L.Ed.2d 650 (1970), and there outlined. It had been formulated in light of the decision of the Supreme Court in Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), which invalidated as unauthorized by either Executive Order or legislation the security program then before the Court. The present program prescribes standards to govern access to classified information of employees in industry in connection with the employer's obligations with respect to bidding on, or the negotiation, award, performance, or termination of contracts with the Defense Department. The basic standard for giving such security clearance is 'a finding that to do so is clearly consistent with the national interest.'[3] Among many details of the program is a list of criteria enumerated in the Directive to aid in determining whether clearance should be granted to an individual employee.[4] The determination is to be made on the basis of an evidentiary hearing by a Hearing Examiner, whose determination is reviewable by an Appeals Board.[5] The ultimate action is required to be that of a designated Presidentially appointed official of the Department. In this case the Deputy Secretary of Defense was this designee.[6]
 
 
 4
 * At the time this matter involving Mr. Wentworth arose he had been granted security clearance for the position he held with a defense contractor. A question arose as to whether his clearance should be continued when in 1966 it came to the attention of ISCRO that he may have engaged in certain homosexual activity with a high school senior in 1964. An investigation and a hearing ensued. The examiner determined that under Criteria P and S[7] appellee's clearance should be revoked. On appeal to it an Appeals Board remanded the matter for a supplementary hearing.[8]
 
 
 5
 At the conclusion of the second hearing the Examiner again concluded that 'it is not clearly consistent with the national interest to grant security to the Applicant at any level.' The Examiner found on the basis of appellee's past homosexual activity and his intention to continue such activity, that he was engaging in both criminal conduct and sexual perversion under Criterion P.[9]
 
 
 6
 The Examiner also concluded that appellee was liable to coercion and influence, Criterion S, notwithstanding the public disclosures he had made regarding his homosexuality. The basis for this finding was Mr. Wentworth's denial of having engaged in homosexual activities with the high school senior, including its less discreet aspects,[10] and the fact that homosexuals as a class are amenable to blackmail.[11] The Appeals Board, having considered 'the complete record,' affirmed the decision of the Examiner as to all factual allegations and conclusions.[12] On the basis of these determinations Mr. Wentworth's clearance was revoked.
 
 
 7
 Suit to set aside the revocation was filed in the District Court. The court granted summary judgment in Mr. Wentworth's favor on the basis of the administratative record and further evidence adduced before the court. Wentworth v. Laird, 348 F.Supp. 1153 (D.D.C.1972). The order of the court set aside the revocation, with the right of defendant officials, the appellants, to 'continue to review plaintiff's (appellee's) eligibility for continuation of his security clearance, subject to the limitations set forth in' the court's Memorandum opinion. The court held that Mr. Wentworth had not received a fair and impartial hearing for the following briefly outlined reasons:
 
 
 8
 Plaintiff's sexual life-style as an admitted on-going homosexual was deemed by the ISCRO without more to be an adequate basis for the withdrawal of his security clearance; no other evidence was presented as reason to believe Mr. Wentworth was susceptible 'to coercion, influence of pressure which may be likely to cause action contrary to the national interest,' Criterion S, upon which the agency placed reliance for revoking the clearance; and in the context of the case his admitted homosexuality alone did not furnish reasonable justification for its conclusion. In this connection the court outlined appellee's action in publicizing his homosexuality. Reliance was also placed by the court upon the absence of any indication in Mr. Wentworth's record of any dereliction with respect to security.
 
 
 9
 In addition to the foregoing the court held that Mr. Wentworth, over his objection, 'was required to respond to a shocking array of questions concerning the most intimate details of his sex life,' with no nexus shown to exist between the information sought and his ability to protect classified information. Thus, the court held the questions flagrantly violated appellee's First Amendment right to privacy, tainting the fairness of the entire administrative proceedings.
 
 
 10
 On this appeal by the departmental officials we note preliminarily that appellee has raised no question as to the validity of the basic standard for security clearance, namely, a finding that such clearance is clearly consistent with the national interest. Moreover, the appeal is not concerned with procedural problems other than those we shall discuss.
 
 II
 
 11
 Appellee contends that the program is pervaded with bias and monolithic procedures that deprived him of a fair and impartial administrative determination. He rests this position in part on a claim of ex parte contacts in violation of section 5(c) of the Administrative Procedure Act, 5 U.S.C. 554(d) (1970), between Mr. Scanlon, the Director of ISCRO, and both the Hearing Examiner and the Appeals Board. This claim is based on evidence which the District Court allowed appellee to adduce dehors the administrative record in an exploration of the operations of ISCRO, with special reference to implications affecting homosexuals. Appellants urge that such a collateral attack on the integrity of administrative proceedings is permissible only when the administrative record reveals a prima facie case of misconduct, citing Singer Sewing Machine Co. v. NLRB, 329 F.2d 200 (4th Cir. 1964). We need not decide this controversy. In the first place we find no lack of fair procedure in those terms of the program itself which are involved in this case, formulated under the general authority of the Executive Order. They satisfy the requirements of Greene v. McElroy, supra. In the second place, for reasons to be explained, Mr. Wentworth will be given by this court the right to a reconsideration of his eligibility for security clearance. Such reconsideration must be entirely clear of any interference by the Director with the deciding officials in their consideration of the merits of the case. We think this is not only required by Greene v. McElroy, supra, but also is the intendment of the Executive Order.[13]
 
 
 12
 Moreover, in view of the history of the case, the proceedings on reconsideration, should they occur, must be left to a different Hearing Examiner and a different Appeals Board, and any part of the record previously made which might appropriately be utilized in further proceedings shall not include the answers to the questions which go beyond what we hold in Part V of this opinion to be appropriate. We set forth these guides for the future without impugning to any degree the rectitude and good faith of the officials who participated in the previous determinations, but to relieve them of the difficulty of ridding themselves of prior positions taken, in part, on a record which was erroneously prepared in part, and, also, to relieve appellee of the possible effect of their prior participation.
 
 III
 
 13
 We are unable to agree with the District Court that the revocation was based upon the concession of appellee that he was leading an on-going homesexual life, without more. The court held that aside from appellee's admitted homesexuality, and his affirmation of intending to continue such a sexual life, 'no evidence was presented of 'any facts and circumstances which furnish reason to believe that the individual may be subjected to coercion, influence or pressure which may be likely to cause action contrary to the national interest," as found by appellants. 348 F.Supp. at 1155, quoting Criterion S. In this same connection, it is contended by appellee that there is a 'per se' rule within the agency which in its operation leads to denial of clearance to any employee who is an active on-going homosexual, a rule which renders invalid denial of clearance to such an applicant. As we understand this contention in the context of this case, it is that Mr. Wentworth was not accorded a determination related only to himself but was the victim of a rule which gave no consideration to the merits of his own case in terms of the national interest. The contention resorts in significant part to evidence adduced at appellee's exploration in the District Court, to which we have referred, of the manner in which the program is administered, principally evidence supplied on appellee's examination of Mr. Scanlon. He denied the existence of such a 'per se' rule, though he could not recall a case of a known on-going homosexual to whom clearance had been granted.[14]
 
 
 14
 While we appreciate the significance of Mr. Scanlon's admission, which was weighed by the District Court alongside Mr. Wentworth's own record of performance under security clearance, we cannot say that the record permits the court to conclude that the ISCRO was applying a per se rule without any consideration of appellee's individual case. Furthermore, the Board's remand for a supplementary hearing, even though appellee had admitted to being a homosexual, indicates that the determinations were not the result of a per se rule denying clearance to homosexuals.
 
 IV
 
 15
 Appellee also contends that the revocation was not justified because a nexus, or a sufficient rational connection, between appellee's homosexual activity and his ability to safeguard classified information was not shown to exist in the ISCRO's decisions. The conclusion that retention of his clearance was not clearly consistent with the national interest was made in light of determinations with respect to Criteria P and S. Under the former Criterion, the determinations attach 'criminal' and 'sexual perversion' attributes to appellee's homosexual activity. The Examiner found, and it is not disputed, that such conduct by appellee, which he admittedly engaged in and intends to continue so to do, violates the criminal laws of the State in which appellee resides and that of every other state except Illinois.[15] Appellee does contest, however, on the basis of the expert testimony presented at the hearing in his behalf that homosexual conduct is a form of 'sexual perversion.' Contrary to the opinion of these experts, we think it clear that 'sexual perversion' referred to in Criterion P must be construed as intended to include homosexual activity within its meaning. This court has implicitly so held in Adams v. Laird, supra, 136 U.S.App.D.C. at 391, n. 1, 420 F.2d at 233, n. 1. Similarly, the Supreme Court in Boutilier v. Immigration and Naturalization Service, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967)[16] held that an alien, who at the time of his entry into the United States was a homosexual, was excludable under section 212(a)(4) of the Immigration and Nationality Act of 1952[17] as one 'afflicted with (a) psychopathic personality,' a term Congress clearly intended to include homosexuals: 'We, therefore, conclude that the Congress used the phrase 'psychopathic personality' not in the clinical sense, but to effectuate its purpose to exclude from entry all homosexuals and other sex perverts.' 387 U.S. at 122, 87 S.Ct. at 1566. We put aside, as unnecessary to a disposition of this case, whether or not a determination under Criterion P alone would support denial of clearance if so decreed under the program.
 
 
 16
 With respect to the determinations made that appellee was susceptible to coercion, influence and pressure, Criterion S, although the District Court concluded that no nexus between appellee's homosexual activities and such susceptibility was established, we do not rule out as a matter of law, as appellee would hbave us do, any consideration of would have us do, any consideration of determination with respect to security clearance under Criterion S, under other Criteria of the Directive, or if rationally accorded consideration for other reasons by those primarily responsible in the matter.[18] In a different but not unrelated context, a rational connection or nexus was found to exist between homosexual conduct and the efficiency of service in public employment. In Dew v. Halaby, 115 U.S.App.D.C. 171, 317 F.2d 582 (1963), petition for cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 550 (1964),[19] this court, after a detailed analysis of the rational connection between homosexual conduct and consideration of the efficiency of the service, upheld the discharge of a veteran holding a civil service position as an air traffic controller because of pre-employment homosexual activity and marijuana smoking. The serious dispute grew out of the fact that the conduct occurred prior to his employment. Reliance by the court upon such conduct drew a strong dissent, and the authority of this decision may be questioned by the fact that the writ of certiorari was dismissed when the agency rescinded its action.[20] In Scott v. Macy, 131 U.S.App.D.C. 93, 402 F.2d 644 (1968), this court reversed a decision of the Civil Service Commission adverse to the applicant for lack of procedural due process, a failure to specify the grounds for the determination. 131 U.S.App.D.C. at 97, 402 F.2d at 648. In his dissent, Burger, J., now Chief Justice, found no procedural error and reached the merits, stating:
 
 
 17
 That some human infirmities are beyond the control of the applicant may be unfortunate but it does not undermine the power of the Executive to hire only those whose employment will 'best promote the efficiency' of the public service. Do my colleagues now decide sub silentio that the government must employ sex deviates or that the efficiency of public service is promoted by doing so? Or do they decide that questions may not be asked by the Commission if investigation reveals arrests or association with known criminals or convictions which the applicant did not reveal?
 
 
 18
 131 U.S.App.D.C. at 101, 402 F.2d at 652.
 
 
 19
 In Norton v. Macy, supra, although the court repudiated the authority of the Civil Service Commission to preclude judicial determination whether the homesexual conduct had some ascertainable deleterious effect upon public employment by characterizing it as 'immoral' or 'indecent,' the opinion nevertheless concludes an employee's homosexual conduct may affect the efficiency of the service:
 
 
 20
 The homosexual conduct of an employee might bear on the efficiency of the service in a number of ways. Because of the potential for blackmail, it might jeopardize the security of classified communications. As we acknowledged in Dew v. Halaby, it may in some circumstances be evidence of an unstable personality unsuited for certain kinds of work. If an employee makes offensive overtures while on the job, or if his conduct is notorious, the reactions of other employees and of the public with whom he comes in contact in the performance of his official functions may be taken into account. Whether or not such potential consequences would justify removal, they are at least broadly relevant to 'the efficiency of the service.' 135 U.S.App.D.C. at 219, 417 F.2d at 1166.[21] Thus the court said that a rational connection between an employee's homosexual conduct and the efficiency of the service may exist. If so, then homosexual activity may be considered in determining the issue of security clearance in a situation where the acceptable degree of risk to the national security is less than the risk to the efficiency of the service with respect to civil service employment generally.
 
 
 21
 This court in Adams v. Laird, supra, affirmed the revocation of clearance to an applicant because of his homosexual activity. The court, in upholding the sufficiency of the standard as applied to a homosexual, stated:
 
 
 22
 DOD 5220.6 sets forth many 'Criteria,' which include ample indications that a practicing homosexual may pose serious problems for the Defense Department in making the requisite finding for security clearance. They refer expressly to the factors of emotional instability and possible subjection to sinister pressures and influences which have traditionally been the lot of homosexuals living in what is, for better or worse, a society strongly oriented towards heterosexuality.
 
 
 23
 136 U.S.App.D.C. at 397, 420 F.2d at 239. We note, however, that inAdams 239. We note, however, that in Adams the existence of a nexus but rather to prevent a finding that he had engaged in the alleged homosexual acts. 136 U.S.App.D.C. at 398, n. 8, 420 F.2d at 240, n. 8.[22]
 
 
 24
 With respect to the sufficiency of proof of a nexus between the conduct involved and security clearance, Adams does not require, as we construe it, objective or direct evidence:
 
 
 25
 We know of no constitutional requirement that the President must, in seeking to safeguard the integrity of classified information, provide that a security clearance must be granted unless it be affirmatively proven that the applicant 'would use' it improperly.
 
 
 26
 136 U.S.App.D.C. at 397, 420 F.2d at 239. Nor is it necessary to prove he has used it improperly. What is required is that every application for clearance must be considered in its particular factual setting. 32 C.F.R. 155.4(e). In Mr. Wentworth's case, this includes the favorable aspects of his life, and in connection with Criterion S such cricumstances as the extent of public knowledge of his sexual life, and the absence of any record of unfaithfulness to duty.[23] As in other decisions of importance the bearing of particular conduct upon an issue to be decided must be left to a rational appraisal based on relevant facts. The determination in these cases of security clearance is a judgmental one based on 'over-all common sense,'[24] and is to be explained in such manner that a reviewing court may be able to discern whether there is a rational connection between the facts relied upon and the conclusions drawn. Judicial acceptance of the determination, and its underlying rationale, calls for consideration of an individual's entitlement to the use of his skills and talents[25] to the full extent compatible with a finding that such use is clearly consistent with the national interest. Some deference must be accorded by the courts to the conclusion of the authorities charged with responsibility under the Executive Order and Directive. The degree of this deference must be the result of a nice but not-easily-definable weighing of the ingredients of which the particular case is comprised.
 
 V
 
 27
 We now come to the reason we affirm the decision of the District Court setting aside the revocation of appellee's security clearance. We agree with the court with respect to the 'shocking array of questions,' a wide-ranging fishing expedition which, aside from the limitation contained in the Executive Order on unreasonable encroachments upon individual interests, infra, is indicative in this case of an ill-defined approach to the problem which has not been justified. We also agree with the provision in the court's order that appellants may continue to review appellee's eligibility for clearance, but we hold that this right is now to be exercised consistently with this opinion rather than subject to the opinion of the District Court other than with respect to the questions asked of Mr. Wentworth.
 
 
 28
 We find it unnecessary to rest upon the First Amendment in holding the questions went too far. To require answers exceeded the authority of appellants under their basic charter, Executive Order No. 10865, which states:
 
 
 29
 It is a fundamental principle of our Government to protect the interests of individuals against unreasonable or unwarranted encroachment . . ..[26]
 
 
 30
 The questions asked of appellee offended this limitation.[27] In so holding we do not preclude appellants, however, from seeking information from an applicant as to whether he has led and intends to lead a homosexual life, and other relevant information respecting particular conduct; but information as to his sexual life must be only that which is reasonably necessary to make a determination with respect to any criteria being invoked:
 
 
 31
 One seeking employment with the federal government may well be placed under greater obligation to communicate information about himself than one who is not. But it may also be true that federal applicants for employment do not, wholly apart from Fifth Amendment concerns, forfeit all rights of privacy accorded to persons generally by the First Amendment, and that the reasonableness of requiring answers to certain questions may be greatly affected by the clarity and rationality of the policies sought to be effectuated by the questions. Where disclosure is required of circumstances of an intensely private and personal nature, the discloser is arguably entitled to know the standards by which his revelations will be assessed.
 
 
 32
 Scott v. Macy, supra, 131 U.S.App.D.C. at 97, 402 F.2d at 648.
 
 
 33
 In the present case, Mr. Wentworth admitted that he was an active homosexual, thereby disclosing sufficient information with respect to the 'sexual perversion' and probably also the 'criminal . . . conduct' factors of Criterion P. Whatever further information is sought with respect to other criteria, including Criterion S, it must not only be relevant but no more intrusive of the applicant's privacy than is reasonably necessary. Moreover, in approving as we do the right of appellants to proceed so as to enable the responsible officials to be relevantly and materially informed, reasonable latitude must be accorded the applicant as to the specificity of his answers to permissible questions-- some reasonable imprecision where precision is not essential. Moreover, the identity of sex partners is not to be insisted upon, unless in a particular case some special reason can be held to justify it.
 
 
 34
 Our position that the questions posed to Mr. Wentworth were not authorized by the Executive Order-- that they went too far-- gains some support from the government itself: in Gayer v. Laird, 332 F.Supp. 169 (D.D.C.1971), answers to questions similar to those posed to Mr. Wentworth were not deemed essential. Furthermore, we have no present basis for holding that more than the general information sought in Gayer should be sought with respect to Mr. Wentworth's homosexual activity. In so holding, however, we do not preclude development of any special circumstances of which appellants may be informed in the individual case, the development of which may afford a more accurate framework of the applicant's homosexual life.
 
 
 35
 In sum, the program is entitled to develop the kind of deviant sexual life the applicant lives, with such subsidiary and special circumstances in a particular case as may reasonably be deemed helpful in appraising the application under criteria related to giving security clearance which is 'clearly consistent with the national interest'; but a homosexual applicant is not required to suffer the severe invasion of personality and the indignities incident to the detailed inquisition required of Mr. Wentworth. A rounded exposition of the situation, of its scope, duration, recency, likelihood of continuance, and associations involved, does not so require.
 
 CONCLUSION
 
 36
 Mr. Wentworth did not stand on his objection to the questions which we hold were impermissible. He answered them. He should not have been required to do so, because, even if relevant, they went beyond the authority of appellants under the executive Order-- relevance is not co-extensive with competence in the law of evidence.
 
 
 37
 The determinations, respectively, of the Hearing Examiner and Appeals Board rested in part upon the answers given. The Appeals Board's determination is explicit in that regard: it rests upon the 'complete record.' That of the Hearing Examiner is implicitly to the same effect. Since the data thus elicited should not have been available, but was considered to the detriment of appellee, we cannot say no prejudice resulted.
 
 
 38
 The question remains as to what now is to be done. There may be more than one answer, but we have concluded that although Mr. Wentworth's security clearance was erroneously revoked for the reason we have accepted, appellants may, if so advised, initiate new proceedings to be conducted consistently with our opinion. In the meantime if it is desired to alter the existing status of the matter pending such proceedings this court would consider any application to that end which might be made.
 
 
 39
 No. 71-1934-- Gayer v. Schlesinger, et al.
 
 
 40
 No. 71-1935-- Ulrich v. Schlesinger, et al.
 
 
 41
 Both Mr. Gayer and Mr. Ulrich had been granted security clearance for employment in defense industry. In the course of his employment each was separately investigated under the security program described in Wentworth. The cause of the investigation was information indicating each was leading the life of a homosexual. Appellant officials and those acting for them, in the course of the investigations, submitted to Mr. Gayer and Mr. Ulrich a series of questions designed to develop details of their respective homosexual lives, if in fact either was leading such a life. Each refused to respond to the questions, but advised the investigators that he was in fact leading an active homosexual life and intended to continue to do so. Their refusals to respond to the questions submitted were on the ground that the details sought invaded their protected privacy and answers were not needed in order to enable appellants to make an affirmative finding favorable to security clearance in each case. Because of their refusals the security clearance of each was suspended for willful failure to provide information essential to a well-informed determination with respect to continued clearance, a reason based on section V-B of the Directive, set forth in pertinent part in the margin.[28] Further processing of each case was discontinued.
 
 
 42
 Their respective suits in the District Court followed as a result of which in each case the court concluded:[29]
 
 
 43
 2. In normal circumstances, there is a right under the First Amendment for an individual to keep private the details of his sex life, and this applies to homosexuals, professed or otherwise . . ..
 
 
 44
 3. In connection with professed homosexuals, a category into which plaintiff falls, where a man has admitted that he is a homosexual and will continue to be one, there must be proof of a nexus between that condition and his ability effectively to protect classified information . . ..
 
 
 45
 4. In the context of the circumstances of plaintiff's case, the questions asked of plaintiff are a violation of his First Amendment right to privacy and lack the necessary nexus to a determination of whether plaintiff is effectively able to safeguard classified information . . ..
 
 
 46
 In setting aside the suspension of appellees' security clearance for the above reasons the court authorized appellants to 'continue to review' appellees' 'eligibility for continuation of security clearance in accordance with their established procedures so long as they proceed on the basis of information which excludes the type of detail they have sought to elicit . . .'[30] from appellees through the questions they were requested to answer.
 
 
 47
 We understand the District Court's ruling to be that in the case of an admitted homosexual suspension for refusal to answer questions pertaining to the applicant's homosexual activities is not justified unless a rational connection, or nexus, between the condition and 'his ability to effectively protect classified information' is shown to exist; absent such a nexus neither inquiry into the privacy of the applicant's sex life nor an adverse determination with respect to security clearance is permissible.
 
 
 48
 Suspension of clearance in the cases of Gayer and Ulrich did not occur on the basis of their acknowledged homosexual lives, without more. Rather, the suspensions were based on the inability of appellants to continue clearance without the applicants first disclosing additional information pertaining to the details of their homosexual activities sought by the authorities. As we have explained in Wentworth, determination of the nexus problem-- to be resolved in the first instance by appellants-- may await further development beyond the fact that the applicant is leading an active homosexual life and intends to continue to do so.
 
 
 49
 While we think that some of the information sought by the authorities went beyond the boundaries permissible under the Executive Order, we do not exclude further inquiry which is relevant and is no more intrusive of an applicant's privacy than is reasonably necessary for a rational judgment to be reached with respect to security clearance. Accordingly, suspension of clearance is permissible where an applicant refuses to disclose such information which he can supply, although he is under no legal obligation to do so. The situation is analogous in its legal aspects, though not in its factual context, to Blumenthal v. F.C.C., 115 U.S.App.D.C. 305, 308, 318 F.2d 276, 279, cert. denied, 373 U.S. 951, 83 S.Ct. 1679, 10 L.Ed.2d 706 (1963), in which we said:
 
 
 50
 The Fifth Amendment privilege protects a person who invokes it from self-accusation; but when he seeks a license at the hands of an agency acting under the standard of the public interest, and information substantially relevant to that standard is withheld under the privilege, as may be done, the need for information and the cooperation of the applicant with respect to it remains. The agency cannot be required to act without the information.
 
 
 51
 See, Orloff v. Willoughby, 345 U.S. 83, 89-91, 73 S.Ct. 534, 97 L.Ed. 842 (1953); see also, Law Students Research Council v. Wadmond, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), and Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951).
 
 
 52
 In the case of Mr. Gayer, the refusal to furnish any responses to the questions, as they were modified by the Screening Board,[31] which we hold in Wentworth were within the scope of appellants' authority, we think was not justified. True, as we have held in Wentworth, some latitude is permissible as to the precision of answers, but we think failure of Mr. Gayer to direct any answers to the questions other than an acknowledgement of his homosexual life, is fatal to his challenge to the suspension of his clearance. We accordingly shall require his case to be remanded to the administrative level to afford him an opportunity to respond as we have indicated may be required. Should he do so the administrative proceedings may go forward to a conclusion. Failing within a reasonable time, to be fixed by appellants, to avail himself of this opportunity, suspension of his security clearance we think must be sustained.
 
 
 53
 In the case of Mr. Ulrich, in view of the excessive scope of the information sought, by questions similar to those propounded to Mr. Wentworth, which we have held exceeded the authority of appellants, he cannot reasonably be charged with the obligation to have answered, even to the degree we hold should be done by Mr. Gayer. The appropriate action therefore is to affirm the District Court in revoking Mr. Ulrich's suspension, but without prejudice to further proceedings under the clearance program with respect to him within the confines of our Wentworth opinion.[32]
 
 
 54
 Appropriate orders will be entered.
 
 
 55
 LEVENTHAL, Circuit Judge (concurring):*
 
 
 56
 I join in Judge Fahy's opinion as the opinion of the court. It identifies key problems. My addition here relates to matters not discussed by Judge Fahy which I think may be pertinent.
 
 
 57
 The Government agreed that it was not relying on homosexuality as a reason per se, in and of itself, for denying the clearance requested.[1] The applicant's own public revelation avoids the usual blackmail threat, of disclosure of homosexuality, ordinarily relied upon as a reason for such denial. That does not necessarily end the inquiry, but it suffices to establish that if the agency seeks to justify further inquiry into the details of what would ordinarily be considered the private sexual life of the applicant, as a matter required by the public interest, it must identify with particularity the relevance of such further inquiry with respect to applicable criteria.
 
 
 58
 The need for clarity of analysis is underscored, for example, by what seems to be the Government's claim of a need to explore the details of appellees' conduct, apparently whether it was limited to e.g., frottage, or whether it included the 'criminal conduct' of sodomy or fellatio,[2] which violates D.C.Code 22-3502. We were advised by appellants' counsel, at oral argument earlier this year, that eight months previous, in a test litigation,[3] the police denied 'that they enforce D.C.Code 22-3502 in such a manner that consenting adults who commit homosexual acts of sodomy in private are subject to search or arrest' and the Corporation Counsel stipulated with plaintiffs that the D.C.Code 22-3502 'does not apply, and cannot be applied, to private consensual sexual acts involving adults (persons are 16 and over) . . ..'[4]
 
 
 59
 The United States Attorney apparently takes a different position as to D.C.Code 22-3502, but this court should certainly have been advised that the statement in the Government brief was the subject of what must at a minimum be recognized as a difference of approach. In United States v. Richard E. Griffith, Superior Court Criminal No. 53440-72, Chief Judge Greene wrote an opinion on March 19, 1973 (101 Wash.L.Rep. No. 80, p. 763), which reviewed the effort of the United States Attorney to establish a different position from that followed by the police and agreed to by the Corporation Counsel, and held, citing rulings of the Superior Court and other courts, that the sodomy statute, D.C.Code 22-3502, was limited to instances where there was no voluntary consent.[5]
 
 
 60
 The foregoing puts a dent into the assumption of Government counsel that homosexual conduct 'usually' results in criminal conduct. There remains the question whether, to what extent, and under what conditions, activities that are not illegal may be a valid springboard for inquiry into aspects of the person's life that are generally assumed to be private in order to ascertain whether such activities include instances of criminal conduct. Questioning in the zone that is normally private should certainly not be pursued in the absence of ascertainable and justified criteria.
 
 
 61
 ROBB, Circuit Judge (concurring in part, dissenting in part):
 
 
 62
 I concur in Judge Fahy's conclusion that there may be a rational connection between an employee's homosexual conduct and the efficiency of the service, and that homosexual activity may be considered in determining eligibility for security clearance. I agree that the government may seek 'information from an applicant as to whether he has led and intends to lead a homosexual life, and other relevant information respecting particular conduct . . . the development of which may afford a more accurate framework of the applicant's homosexual life.' (pp. 751, 752). As Judge Fahy well says, the government 'is entitled to develop the kind of deviant sexual life the applicant lives, with such subsidiary and special circumstances in a particular case as may reasonably be deemed helpful', (p. 752) so as to elicit a 'rounded exposition of the situation, of its scope, duration, recency, likelihood of continuance (and) associations involved'. (P. 752). I also agree that the inquiry should be no more extensive than reasonably necessary. Finally, I concur in the opinion that the questions directed to Mr. Gayer were permissible. These questions were:
 
 II.
 
 63
 Have you ever engaged in any homosexual act(s) or any act(s) of sexual perversion with (an) other male person(s)?
 
 III.
 
 64
 (If the answer to Question II. is 'Yes,' answer the following): 1. Name or describe the sexual acts engaged in with other male(s): 2. Approximately how many such acts have occurred? 3. Dates (approximate) or the period within which such acts have been engaged in: 4. Where were such acts performed? 6. What were the circumstances leading to the last such act? (Be specific as to where, when . . . the act was performed). (J.A. 41).
 
 
 65
 The questions put to Mr. Ulrich followed the pattern of the Gayer questionnaire, but the questions were sharpened by referring in a check list to certain specific types of homosexual acts. In addition, Mr. Ulrich was asked whether any such acts had been performed in public, whether his homosexual partners were strangers or persons with whom he lived or maintained a permanent relationship, and the number of persons with whom he had engaged in such acts. The identity of his sex partners was not demanded.
 
 
 66
 Without saying which of the questions put to Mr. Ulrich are found to be impermissible the court's opinion concludes that 'some of the information sought by the authorities went beyond the boundaries permissible under the Executive Order'. (P. 754). I cannot accept this conclusion. In my opinion the questions were reasonably designed to develop the kind of deviant sexual life that Mr. Ulrich lived and proposed to continue. If the questions put to Mr. Gayer were proper, and the court agrees that they were, then I think the Ulrich interrogatories were also proper.
 
 
 67
 The questioning of Mr. Wentworth occurred in the course of a hearing before a trial examiner. In his opening statement at the hearing, counsel for Mr. Wentworth said:
 
 
 68
 We state for the world, as we have stated for the public, we state for the record and, if the Department forces us to carry the case that far, we state for the courts that Mr. Wentworth, being a healthy, unmarried, homosexual male, 35 years old, has lived, and does live a suitable homosexual sexual life, . . . and intends to continue to do so indefinitely into the future, and please underline starting with the word 'and intends to do so into the future,' underline that, please, Mr. Stenographer.
 
 
 69
 We, including specifically Mr. Wentworth, come into this hearing holding our heads high, proud of our homosexuality, and proud to be homosexuals. (Tr. 32, 33).
 
 
 70
 In this context government counsel undertook to develop for the record the nature and extent of Mr. Wentworth's homosexual activity, again following the general pattern of the Gayer questionnaire and the questions put to Mr. Ulrich. The information elicited was summarized by the Examiner as follows:
 
 
 71
 a. He (Mr. Wentworth) has been an active, practicing homosexual continuously since he was about ten years of age.
 
 
 72
 b. When he attended college, he occasionally engaged in acts of fellatio in which he was sometimes the insertor and sometimes the receptor.
 
 
 73
 c. Since leaving college, in 1955, he has engaged in homosexual acts with approximately seventy-five to a hundred males. He has met these partners at bars and at other places of public assemblage, and at parties given by friends of his, who are homosexuals. He has had one sexual relationship only with some of these men, and with others he has had continued sexual relationships. He usually engages in acts of mutual fellatio and also engages in acts of anal intercourse as the insertor and the receptor.
 
 
 74
 d. He denies ever engaging in these sexual acts in a public place.
 
 
 75
 e. He intends to continue this conduct in the future.
 
 
 76
 f. . . . he has always denied that he has ever engaged in acts of a homosexual nature with one, John , as alleged in the Statement of Reasons. (J.A. 36, 37).
 
 
 77
 The 'Statement of Reasons' or charge served upon Mr. Wentworth alleged that 'For approximately three months within the period 1962 to 1965, you engaged in numerous perverted acts of a homosexual nature with one John .' (J.A. 35).
 
 
 78
 On two grounds I think the questioning of Mr. Wentworth was permissible.
 
 
 79
 (1) At the hearing the witness John testified that for several months in 1964, when he was an eighteen-year old high school student, he maintained a homosexual relationship with Mr. Wentworth. He described their homosexual acts in minute and vivid detail. This testimony came on both direct and cross examination, all without objection. Many of the questions now found obnoxious were put to John on cross examination by Mr. Wentworth's counsel. On the other hand, Mr. Wentworth in his testimony denied that he had engaged in any homosexual acts with John. In this situation I think it was permissible for government counsel, on cross examination of Mr. Wentworth, to put questions that reflected or followed the pattern of the specific and detailed allegations made by John. Since John had testified that he and Mr. Wentworth had engaged in certain specific types of homosexual acts it was reasonable for government counsel to ask Mr. Wentworth whether he had engaged in such activity with anyone.
 
 
 80
 (2) In a security hearing for a man holding a Secret clearance[1] and boasting of his homosexuality I cannot say that the information disclosed about Mr. Wentworth was irrelevant or that the effort to develop the facts on cross examination was an unreasonable or unwarranted encroachment on Mr. Wentworth's privacy. Since homosexuality was relevant to eligibility for clearance, it was important to determine the exact meaning of the term homosexual as Mr. Wentworth applied it to himself. Were his homosexual activities carried on discreetly in private, limited to one partner, or were they open, promiscuous and aggressive? Were they infrequent and sporadic, or otherwise? In short, what kind of a homsexual was he? He could not foreclose interrogation on this issue by stipulating in general terms that he was a homosexual.
 
 
 81
 I agree that some of the questions put to Mr. Wentworth were unpleasant and indelicate. They would not have been acceptable in a drawing room, but having announced to the world that he was proud to be a homosexual Mr. Wentworth should not have been offended or shocked by questions seeking to determine precisely what he meant by his description of himself. And as I have said, similar questions had been put to the witness John by Mr. Wentworth's counsel.
 
 
 82
 I would reverse all three judgments.
 
 
 
 [1]
 Executive Order 10865, as amended, 3 C.F.R. at 83 (1972)
 
 
 [2]
 Defense Directive 5220.6, 32 C.F.R. 155 (1972)
 
 
 [3]
 32 C.F.R. 155.4(a) (1972)
 
 
 [4]
 32 C.F.R. 155.5 (1972). Section V.E. of the Directive, 32 C.F.R. 155.4(e), provides that matters described in the criteria
 . . . may, in the light of all the surrounding circumstance, be the basis for denying or revoking a clearance. The conduct varies in implication, degree of seriousness, and significance depending upon all the factors in a particular case. Therefore, the ultimate determination must be an overall common sense one based upon all the information which may properly be considered under this part including, but not limited to, such factors as the following: The seriousness of the conduct, its implications, its recency, the motivations for it, the extent to which it was voluntary and undertaken with knowledge of the circumstances involved and, to the extent that it can be estimated and is appropriate in a particular case, the probability that it will continue in the future.
 
 
 [5]
 32 C.F.R. 155.7(b) and (f) (1972)
 
 
 [6]
 32 C.F.R. 155.7(f)(5) (1972)
 
 
 [7]
 32 C.F.R. 155.5 which provides:
 The criteria for determining eligibility for a clearance shall relate, but not be limited to the following:
 (p) Any criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, habitual use of intoxicants to excess, drug addiction, or sexual perversion.
 (s) Any facts or circumstances which furnish reason to believe that the individual may be subjected to coercion, influence, or pressure which may be likely to cause action contrary to the national interest . . ..
 
 
 [8]
 The Board stated in part as follows:
 In the instant case, applicant is alleged to have engaged in homosexual conduct over a period of three months during the Fall of 1964 . . .. The Statement of Reasons does not allege, nor is there any direct evidence of any further homosexual conduct on the part of the applicant . . .. . . . We believe a sound basis exists for inquiry into the probability that applicant's sexually perverted conduct will continue . . .. Opportunity will be provided for the presentation of evidence on issues which have been generated since the hearing (Mr. Wentworth had made public disclosures concerning his homosexuality), and for the applicant to present further information on matters which he may desire to develop . . ..
 
 
 [9]
 The Examiner stated:
 There is no contradictory evidence in this case as to whether this conduct that Applicant engages in, and will continue to engage in, is criminal conduct. It is clearly established that it is not only criminal conduct in the State in which the Applicant resides, but it is also criminal conduct according to the statutes of every State in the United States except the State of Illinois. Thus, Applicant will probably, in the future, engage in criminal conduct, as he has done for a long time past.
 This conduct is unquestionably sexual perversion . . ..
 
 
 [10]
 See note 8, supra
 
 
 [11]
 The Examiner stated:
 . . . The evidence is strong and continuing, that when Applicant is confronted, as he has been since the origin of this case, with a specific charge of facts with a specific person . . . and where he may suffer a disability thereby, he vehemently denies same in the face of overwhelming proof of the charge.
 Whether Applicant actually would be subjected to coercion, influence or pressure because of his criminal conduct is, of course, unknown; and what he would actually do in such an event is also not known. But he is one of a class of people who, it is established, are amenable to blackmail, and those who do not submit are considered by Applicant's own expert witness to be rare . . ..
 
 
 [12]
 The Board concluded in part as follows:
 Applicant claims that his conduct is widely known because of press releases which he had distributed. Department Counsel concedes that applicant's personal representative mailed out documents for press release. No information is available as to the extent of dissemination of those releases. However, even were the releases to have received wide publicity, that fact would serve only to accentuate applicant's susceptibility as a target for possible efforts to obtain classified information in an improper manner.
 Applicant endeavored to establish through testimony of expert witnesses that his conduct was not sexual perversion, and that in fact there is no such thing as sexual perversion. While the testimony of witnesses as to what constitutes sexual perversion reflects their individual opinions, it does not constitute a barrier to a finding that participation in homosexual acts is deemed to be sexual perversion under the provisions of the governing Directive, and may be grounds for denial of security clearance. We determine that applicant's homosexual acts do constitute sexual perversion.
 Applicant argued that his conduct is not criminal because he has not been the subject of conviction therefor. In this connection, he cited a general disinclination to prosecute for homosexual offenses. The failure of the state to prosecute does not constitute a finding that the conduct did not occur. So long as applicant exercises his stated intention to continue to engage in activity proscribed by criminal statute the threat of prosecution will remain.
 
 
 [13]
 In providing for an adversary agency hearing traditional requirements assuring a fair and impartial adjudication are to be complied with, notwithstanding 32 C.F.R. 155.7(c)(1) which states with respect to such hearings, 'The rules, including the rules of evidence, governing court proceedings or administrative hearings conducted under the Administrative Procedure Act are not applicable to hearings under this part.' See, Camero v. United States, 375 F.2d 777, 179 Ct.Cl. 520 (1967)
 
 
 [14]
 Appellee also bases on the deposition of Mr. Scanlon the contention that homosexuals are discriminated against by the ISCRO in its administration of the program. In the examination of Mr. Scanlon in the District Court as to the operations of the Program, when asked whether criminality of other kinds of sexual activity proscribed by statute-- such as fornication, heterosexual sodomy, adultery-- were afforded the same treatment, he said they were not (Dep. pp. 17-19, 26-27, 29-30, 45, 54-55, 62) unless there was a specific reason to believe that the activity might, for example, render the individual susceptible to blackmail. (Dep. pp. 29-30, 37, 38). We think there may be reasonable grounds available to the Department administering the Program which do not require it to probe all criminal sexual conduct which an applicant for clearance might have engaged in, or to give the same weight to all types of such conduct in its considerations under each of the pertinent criteria; or else that its concern with a life of sexual perversion must be held to be illegal as discriminatory, as seems to be the suggestion of appellee. According to Mr. Scanlon's full answer consideration of heterosexual perversion is not excluded from scrutiny under the Program
 
 
 [15]
 See note 9, supra. And see Wainwright v. Stone, 414 U.S. 25, 94 S.Ct. 190, 38 L.Ed.2d 183 (1973)
 
 
 [16]
 Cf., In re Lababy, 326 F.Supp. 924 (S.D.N.Y.1971)
 
 
 [17]
 Act of June 27, 1952, c. 477, Title II, ch. 2, 212(a)(4), 66 Stat. 182, as amended, 8 U.S.C. 1182(a)(4) (1970)
 
 
 [18]
 Government employment in general is not involved. Moreover, the Executive Order explicitly provides that any determination adverse to an applicant 'shall be a determination in terms of the national interest and shall in no sense be a determination as to the loyalty of the applicant concerned.' Section 7 of Executive Order 10865. 3 C.F.R. at 87 (1972)
 
 
 [19]
 The writ of certiorari was dismissed by stipulation of the parties after the Agency rescinded its discharge of appellant and reinstated him with back pay. Norton v. Macy, 135 U.S.App.D.C. 214, 219, 417 F.2d 1161, 1166 (1969)
 
 
 [20]
 See note 19, supra
 
 
 [21]
 See, Anonymous v. Macy, 398 F.2d 317, 318 (5th Cir. 1968) in which the court said with respect to a discharge of a post office employee:
 The fact that appellant committed acts is not in dispute. Counsel for appellant, however, argue at great length, and with considerable ability, that homosexual acts constitute private acts upon the part of such employees, that they do not affect the efficiency of the service, and should not be the basis of discharge. That contention is not accepted by this Court. See Hargett v. Summerfield, 100 U.S.App.D.C. 85, 243 F.2d 29 (1957).
 
 
 [22]
 The Government's policies with respect to homosexuals have been analyzed, without approval, in the following law review articles: Comment, Homosexuals in Government Employment, 3 Seton Hall L.Rev. 89 (1971); Note, Is Government Policy Affecting the Employment of Homosexuals Rational?, 48 N.Caro.L.Rev. 912 (1970); Note, Government Employment and the Homesexual, 45 St. John's L.Rev. 303 (1970); and Note, Government-Created Employment Disabilities of the Homosexual, 82 Harv.L.Rev. 1738 (1969)
 
 
 [23]
 Although the facts in this regard recognized by the District Court are not conclusive they are material in evaluating appellee's suitability for security clearance. The extent to which other considerations might tend to show that appellee is susceptible to coercion under Criterion S is a matter to be assessed in the first instance by ISCRO
 
 
 [24]
 See footnote 4, supra
 
 
 [25]
 '. . . the right to follow his chosen profession . . .' Greene v. McElroy, supra, 360 U.S. at 507, 79 S.Ct. at 1419
 
 
 [26]
 3 C.F.R. at 83 (1972)
 
 
 [27]
 We are not concerned in this case with the consequence of an applicant's refusal to supply the information appropriately sought, 32 C.F.R. 155.4(b), for Mr. Wentworth answered all the questions
 
 
 [28]
 a willful failure or refusal to furnish or to authorize the furnishing of relevant and material information may prevent the Department of Defense from reaching the affirmative finding required . . . in which event any security clearance then in effect shall be suspended by the Assistant Secretary of Defense (Administration), or his designee, and the further processing of his case discontinued
 
 
 [32]
 C.F.R. 155.4(b) (1972)
 
 
 [29]
 Gayer v. Laird, supra, 332 F.Supp. at 171, and Ulrich v. Laird, Civil No. 203-71 (D.D.C.1971). The quoted language is identical in both decisions
 
 
 [30]
 Ibid
 
 
 [31]
 The Screening Board in responding to Mr. Gayer's objections to the questions, explained the relevancy of the questions, modified some of the language of the questions and withdrew the question requiring the identification of sex partners
 
 
 [32]
 We are advised by the Government that neither Mr. Gayer nor Mr. Ulrich are presently employed in a manner requiring clearance. We accordingly avoid passing upon the question whether we should direct clearance be given now to Mr. Ulrich due to out ruling that its suspension was erroneous
 
 
 *
 On April 9, 1974, Judge Leventhal filed an order amending his concurring opinion. For order of amendment, see 494 F.2d 1135
 
 
 [1]
 At oral argument the Government gave us a citation to the decision of the Appellate Division, Second Department, in In re Kimball, 40 A.D.2d 252, 339 N.Y.S.2d 302. The New York Court of Appeals, on July 3, reversed and remanded to the Appellate Division for reconsideration of the application for admission to the bar of an avowed, active homosexual, stating: 'While appellant's status and past conduct may be now and has been in the past violative of accepted norms, they are not controlling, albeit relevant, in assessing character bearing on the right to practice law in this State. Notably, the Committee on Character and Fitness found appellant to be of good character and qualified at this time.' 33 N.Y.2d 586, 347 N.Y.S.2d 453, 301 N.E.2d 436 (1973)
 
 
 [2]
 Government Brief (Nos. 71-1934 & 1935) at 28:
 'Homosexual conduct usually consumates in an act of sodomy or fellatio. These acts . . . are felonies in the District of Columbia, where appellee Ulrich resides,' citing D.C.Code 22-3502.
 
 
 [3]
 Schaefers, et al. v. Jerry Wilson, Chief of Police, Civil Action No. 1821-71, U.S. District Court, District of Columbia
 
 
 [4]
 Oral argument was had in the case at bar January 29, 1973. In the test litigation, the police denial was filed May 1, 1972, and on May 25, 1972, the parties filed the stipulation for dismissal, stipulating as to the meaning of the statute, 'when construed in light of the Constitution (see Griswold v. Connecticut, 381 U.S. 479 (85 S.Ct. 1678, 14 L.Ed.2d 510) (1965)), prior decisional law in this jurisdiction (see Rittenour v. District of Columbia, 163 A.2d 558 (D.C.Mnn.Ct.App. 1960)), and the legislative history of the statute . . ..'
 
 
 [5]
 Other valid statutes prohibit acts on minors and acts committed in public, D.C.Code 22-3501, 22-1121
 
 
 [1]
 Mr. Gayer and Mr. Ulrich also held clearances for access to secret material