**Lukas E. HOSKA, III, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF THE ARMY, Respondent.**

**No. 81–1352.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 3, 1982.

Decided April 30, 1982.

David Alan Lee, Washington, D. C., for petitioner.

Michael Joseph Ryan, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and Royce C. Lamberth, Asst. U. S. Atty., Washington, D. C., were on the brief, for respondent.

Before EDWARDS and GINSBURG, Circuit Judges, and JOHN J. SIRICA,* United States Senior District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Prior to his dismissal from employment, petitioner, Lukas Hoska, III, held the position of Intelligence Operations Specialist with the United States Army Administrative Survey Detachment (hereinafter "USAASD" or "Army"). Between August 1975, when he was hired, and August 1979, when he learned that the Army intended to revoke his security clearance, petitioner performed his job without difficulty and received high praise for his work.[1] In October 1979, however, the Army revoked petitioner's Top Secret security clearance because of alleged security violations, an unfavorable psychiatric evaluation, and several incidents of allegedly indiscreet behavior which the Army contends reflected poor judgment and emotional instability. Because he no longer possessed the required security clearance, the Army dismissed petitioner from his position in September 1980. Petitioner appealed his security clearance revocation and subsequent dismissal to the Merit Systems Protection Board (hereinafter "MSPB"), which affirmed the Army's decision. He now appeals from that MSPB decision.

Based on our review of the record on appeal, we conclude that the evidence presented was wholly inadequate to support the MSPB decision. As discussed in detail below, the Army's case before the MSPB relied almost entirely on unsubstantiated hearsay evidence. The Army offered no evidence to demonstrate either the meaning or the reliability of the obscure conclusions in the psychiatric evaluation, while Hoska introduced evidence of extenuating circumstances that undercut the trustworthiness of the evaluation. Furthermore, the allegations of security violations were all based solely on the hearsay reports of one of Hoska's co-workers. More importantly, the Army did not prove that any of these alleged security violations was in fact a

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1976).

1. On his "Employee Career Appraisal" of September 1979, petitioner received grades of "A" ("exceeds all requirements") for *"stability* (composure and effectiveness under pressure and adverse or changing conditions)" and *"cooperation* (tact, diplomacy and maintaining interpersonal relationships)," and grades of "B" ("satisfies all requirements") for *"oral communication," "written communication," "quantity and timeliness," "technical competence"* and *"special skills and knowledge."* App. 53 (emphasis added). On August 10, 1979, the Commander of petitioner's unit evaluated Mr. Hoska as

> an aggressive, intelligent worker, who learns quickly and is willing to voluntarily work long hours to accomplish the mission. He has performed much more successfully in his initial assignment than is normally expected in a highly complicated, sensitive field. He has been required to perform in a manner requiring much initiative, thoroughness, and detail while making many independent decisions.

App. 63.

breach of any rule, regulation or standard security practice. Finally, and most significantly, the Army failed to demonstrate an adequate nexus between the various incidents of allegedly improper or indiscreet behavior by Hoska and his ability to protect classified information. Under these circumstances, the MSPB decision affirming Hoska's security clearance revocation and resulting dismissal cannot stand.

## I. HISTORY OF THE PROCEEDINGS

Petitioner was hired by the Army as an Intelligence Operations Specialist in August 1975. He obtained the requisite Top Secret security clearance and ultimately was stationed in West Berlin, Germany. In early May 1979, apparently as part of an investigation into petitioner's fitness to retain his security clearance, petitioner was ordered to undergo a psychiatric examination and evaluation in Frankfurt, West Germany. He was provided little explanation other than "that questions regarding [his] stability had been raised." Tr. 89.[2]

On July 30, 1979, the Army's Central Personnel Security Clearance Facility (hereinafter "Clearance Facility") in Fort Meade, Maryland issued petitioner a letter of intent to revoke his security clearance. The letter cited an alleged "pattern of erratic and questionable behavior" by petitioner, including three alleged breaches of security, and the psychiatric evaluation, which concluded that petitioner suffered from "an obsessive-compulsive neurosis." App. 28–29. Petitioner responded to the charges by letter on August 19, 1979. Following his response, the Clearance Facility revoked his security clearance, effective October 25, 1979. The revocation letter stated that Hoska's "sexual mores appear to . . . make him decidedly vulnerable to coercion or blackmail . . . [and his] blatant disregard for established security policies surfaces considerable doubt as to his value in his present capacity." App. 34. It further concluded that "[i]nformation furnished by a number of personnel . . . tends to present the same picture of SUBJECT being a person of somewhat erratic, unstable and indiscreet behavior," and cited the conclusion in the psychiatric evaluation that petitioner had an "obsessive compulsive neurosis." *Id.* at 34–35. The letter did not, however, refer to petitioner's strongly positive Employee Career Appraisals or to the highly praiseworthy evaluation written on August 10, 1979, by the Commander of petitioner's unit. *See* note 1 *supra.*

On July 17, 1980, the USAASD notified petitioner of its intent to terminate his employment because of his failure to retain the required security clearance, to which petitioner responded by letter of counsel on August 13, 1980. The USAASD officially dismissed petitioner on August 26, 1980, effective September 12, 1980.

On September 30, 1980, petitioner appealed his security clearance revocation and employment dismissal to the MSPB, seeking, *inter alia*, reissuance of his security clearance, reinstatement and back pay. A presiding official of the MSPB conducted a hearing at Fort Meade, Maryland on November 19, 1980. The Army presented the testimony of Lt. Colonel Edward Koslosky, the Clearance Facility officer who was responsible for making the recommendation to revoke petitioner's security clearance, Peter R. Nelson, the Army officer who reviewed the decision to revoke petitioner's clearance, Richard F. Judge, the officer in petitioner's unit who was responsible for terminating his employment, and petitioner himself.[3] Each official testified as to the reasons for his decision concerning petitioner. Their decisions apparently were based upon the information in petitioner's file, rather than on any personal knowledge of him or any independent corroboration of the incidents in which he was allegedly involved. Petitioner called upon his wife to

---

**2.** "Tr." refers to the transcript of the hearing before the presiding official of the MSPB on November 19, 1980.

**3.** The Army also offered the testimony of Russell A. Cogar, an Army personnel officer, who testified as to whether petitioner was entitled to disability retirement benefits. *See* Tr. 122–26.

testify about a number of the incidents of alleged indiscretion at which she was present. Charles J. Rubacky, petitioner's "security manager" in Berlin, also testified on petitioner's behalf. Rubacky stated that he had never observed a security breach by petitioner and that the three incidents cited by the Army as security violations did not, in his opinion, constitute violations.

On January 29, 1981, the MSPB presiding official issued his initial decision upholding the actions taken by the Army.[4] The opinion correctly noted that, under 5 U.S.C. § 7701(c)(1)(B) (Supp. IV 1980), an agency decision on appeal to the MSPB "may not be sustained unless that decision is supported by a prepondeance [sic] of the evidence." App. 4.[5] Reviewing the testimony of all the witnesses, the MSPB opinion concluded that the Army decisions to revoke petitioner's clearance and to remove him from the service were supported by a preponderance of the evidence. The MSPB opinion specifically noted that the Army "placed its total reliance upon hearsay evidence." Id. at 8. It also acknowledged that, "[a]s a general rule, hearsay evidence is generally considered to be less reliable than direct evidence which is subject to cross-examination" and that "in determining the preponderance of the evidence, hearsay evidence alone, without sufficient assurance to its truthfulness is not sufficient evidence to overcome sworn testimony." Id. Nonetheless, the MSPB opinion found that, because petitioner admitted to two of the incidents that the Army contended were security violations and to certain other incidents of allegedly indiscreet behavior that the Army relied on in revoking his clearance, there was some non-hearsay testimony in the record. Although the MSPB opinion apparently did not rely on petitioner's direct testimony alone, it concluded that, in light of that testimony, there was a preponderance of evidence in the record as a whole supporting the Army's decision. Id. at 8–9.

## II. THE LEGAL FRAMEWORK FOR REVIEWING THE MSPB's DECISION

### A. The Statutory Standard of Judicial Review

The provisions of the Civil Service Reform Act of 1978 that govern judicial review of MSPB decisions require the court to "review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be—(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence . . . ." 5 U.S.C. § 7703(c) (Supp. IV 1980). Petitioner's basic contention is that the MSPB's decision is unsupported by substantial evidence. The term "substantial evidence" has been interpreted to mean " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)); Johnson v. United States, 628 F.2d 187, 189 (D.C.Cir.1980).

Before reviewing the record to determine whether the MSPB decision meets these statutory standards, we first examine the legal bases for both the Army's decision to revoke petitioner's security clearance and its decision to dismiss him. We also review the "rational nexus" requirement, which we find inherent in the Army's regulation governing security clearance determinations. Finally, given the nature of the Army's presentation to the MSPB, we summarize briefly the general principles governing the

---

**4.** The initial decision of the presiding official became final when the MSPB did not review it within the required time period. 5 C.F.R. § 1201.113 (1981).

**5.** MSPB regulations define "preponderance of the evidence" as "[t]hat degree of relevant evi-

dence which a reasonable mind, considering the record as a whole, might accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true." 5 C.F.R. § 1201.56(c)(2) (1981).

use of hearsay evidence in adjudications before administrative boards such as the MSPB.

B. *The Legal Basis for Petitioner's Dismissal and Security Clearance Revocation*

■ Under the applicable statutory provisions, the Army is entitled to remove a civilian employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (Supp. IV 1980). Petitioner conceded before the MSPB and again in his argument on appeal that, given the need for a Top Secret clearance to perform his job, the Army's decision to terminate his employment was lawful if the revocation of his security clearance was lawful. Conversely, if the Army unlawfully revoked his clearance, his removal from the service was also unlawful, since his removal was based entirely on his failure to retain the security clearance. *See* Petitioner's Brief at 5, 26–27, 41–42. The issue before the court, then, is the lawfulness of petitioner's security clearance revocation.

The Army revoked petitioner's security clearance pursuant to Army Regulation AR 604–5, ¶ 3–1 (May 4, 1972) (hereinafter "Regulation"), which establishes the criteria for granting, denying and revoking security clearances.[6] The Regulation states in part:

> The ultimate determination of whether the granting of a clearance is clearly consistent with the interests of national security must be an overall commonsense determination based upon all available information, both favorable and unfavorable. The granting, denial, or revocation of a security clearance may be a matter of far-reaching consequences to the De-

partment of the Army as well as to the individual concerned. Therefore, arbitrary and perfunctory decisions must be avoided.

*Id.* ¶ 3–1a.[7] The Regulation lists twenty-three factors that "may, depending upon the degree of seriousness, be the basis for denial of access to classified defense information, or revocation of clearance." *Id.* Lt. Colonel Koslosky explained to the MSPB that the revocation of petitioner's security clearance was based upon several of the listed factors. According to his testimony, petitioner's alleged breaches of security constituted a "[w]illful violation or disregard of security regulations" under subsection 14 of the Regulation. *Id.* ¶ 3–1a (14). Petitioner's alleged sexual misconduct and other incidents of indiscretion were viewed by Koslosky as "immoral, or notoriously disgraceful conduct," a relevant factor under subsection 17. *Id.* ¶ 3–1a (17).[8] Finally, according to Koslosky, the allegations in petitioner's psychiatric evaluation indicated poor judgment and a lack of reliability. These latter factors are cited in a number of subsections of the Regulation, specifically subsection 20, which covers

> [a]ny illness, including any mental condition, of a nature which in the opinion of competent medical authority may cause significant defect in the judgment or reliability of the individual, with due regard to the transient or continuing effect of the illness and the medical findings in such case.

*Id.* ¶ 3–1a (20).[9] *See* Tr. 104–06.

C. *The Nexus Requirement*

■ In those cases where court review is sanctioned, it is well established that an

---

6. The MSPB opinion does not even mention this Regulation. Nevertheless, we assume the MSPB found that the Army complied with its requirements because, in order to uphold the Army's decision under the governing statute, it had to conclude that the revocation of petitioner's security clearance was "in accordance with law." 5 U.S.C. § 7701(c)(2)(C) (Supp. IV 1980).

7. The relevant parts of this Regulation are reprinted in the hearing transcript. Tr. 181–84.

8. In full, subsection 17 covers "[a]ny criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct; habitual use of intoxicants to excess; drug abuse; or sexual perversion."

9. Koslosky also indicated, with little explanation, that the psychiatric evaluation was a proper basis for revoking petitioner's security clearance under subsections 18 and 19, which cover:

adverse personnel action cannot withstand judicial scrutiny unless there is some rational nexus between the adverse action taken and the government's articulated reasons for the action. In civil service cases, for instance, numerous judicial opinions have recognized that there must be a rational connection between the dismissal of an employee and the statutory standard of promoting "the efficiency of the service."[10] As the court in *Doe v. Hampton*, 566 F.2d 265 (D.C.Cir.1977), aptly stated:

> In law as well as logic, there must be a clear and direct relationship demonstrated between the articulated grounds for an adverse personnel action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate governmental interest promoting the "efficiency of the service." Absent a nexus between the "cause" asserted—here mental disability—and "promotion of the efficiency of the service," the adverse action must be condemned as arbitrary and capricious for want of a discernible rational basis.

*Id.* at 272 (footnotes omitted); *accord, Bonet v. United States Postal Service*, 661 F.2d 1071, 1074 (5th Cir. 1981); *McClelland v. Andrus*, 606 F.2d 1278, 1291 (D.C.Cir. 1979); *Phillips v. Bergland*, 586 F.2d 1007, 1010–11 (4th Cir. 1978); *Young v. Hampton*, 568 F.2d 1253, 1257–64 (7th Cir. 1977); *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969). The nexus requirement has figured prominently in cases involving judicial review of adverse actions against employees for engaging in allegedly "immoral" or "disgraceful" behavior. *E.g., Bonet v. United States*

*Postal Service*, 661 F.2d at 1074 ("agency [must] establish what has been termed a 'vital nexus' between the misconduct—whether it be criminal, immoral, or both—and the efficiency of the service"); *Norton v. Macy*, 417 F.2d at 1167 ("reviewing court must at least be able to discern some reasonably foreseeable, specific connection between an employee's potentially embarrassing [homosexual] conduct and the efficiency of the service"); *Mindel v. United States Civil Service Commission*, 312 F.Supp. 485, 487 (N.D.Cal.1970) ("Even if [an employee's] conduct can be characterized as 'immoral', he cannot constitutionally be terminated from government service on this ground absent a *rational nexus* between this conduct and his duties as a postal clerk."). *See* note 22 *infra*.

Courts have been equally vigilant in requiring a rational nexus between the denial or revocation of an individual's security clearance and the individual's conduct or other evidence relied upon by the government in denying or revoking the clearance. In *Gayer v. Schlesinger*, 490 F.2d 740 (D.C. Cir.1973), for example, this court explained:

> With respect to the sufficiency of proof of a nexus between the conduct involved and security clearance, . . . [w]hat is required is that every application for clearance must be considered in its particular factual setting. . . . The determination in these cases of security clearance . . . is to be explained in such manner that a reviewing court may be able to discern whether there is a rational connection between the facts relied upon and the conclusions drawn.

(18) Acts of a reckless, irresponsible, or wanton nature which indicate such poor judgment and instability as to suggest that the individual might disclose security information to unauthorized persons or otherwise assist such persons, whether deliberately or inadvertently, in activities inimical to the security of the United States.

(19) All other behavior, activities, or associations which tend to show that the person is not reliable or trustworthy.

AR 604–5, ¶ 3–1*a* (18), (19). *See* Tr. 105–06. During oral argument on this appeal, however, Government counsel frankly conceded that the

psychiatric evaluation alone did not justify the revocation of petitioner's security clearance.

10. 5 U.S.C. § 7513(a) (Supp. IV 1980). This same standard governed civil service dismissals before the Civil Service Reform Act of 1978. *See* 5 U.S.C. § 7501(a) (1976).

The current statute also prohibits an agency from discriminating, in connection with a personnel action, "against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others . . . ." 5 U.S.C. § 2302(b)(10) (Supp. IV 1980).

*Id.* at 750–51. In most security clearance cases, courts have specifically insisted upon a rational nexus between the denial or withdrawal of an individual's security clearance and the individual's ability to protect classified information. *E.g., McKeand v. Laird*, 490 F.2d 1262, 1263–64 (9th Cir. 1973) (rational nexus requirement satisfied because hearing examiner, in denying applicant a security clearance, "made specific findings of fact clearly describing why his homosexuality posed a threat of divulgence of classified material"); *Marks v. Schlesinger*, 384 F.Supp. 1373, 1379 (C.D.Cal.1974) ("the government [must] offer proof of a rational nexus between [individual's] alleged homosexuality and his ability to safeguard classified information"); *Wentworth v. Laird*, 348 F.Supp. 1153, 1155 (D.D.C. 1972) ("in order to deny clearance to an admitted ongoing homosexual . . . there must be proof of a nexus or of a rational connection between such condition and the ability to safeguard classified information"), *aff'd sub nom. Gayer v. Schlesinger*, 490 F.2d 740 (D.C.Cir.1973).

■ In this case, the Army Regulation governing security clearance determinations includes a nexus requirement consistent with the foregoing case law. The Regulation lists a number of "activities and associations" that "may, depending upon the degree of seriousness, be the basis for denial of access to classified defense information, or revocation of clearance." AR 604–5, ¶ 3–1a (May 4, 1972). The Regulation provides a general standard for security clearance determinations—"whether the granting of a clearance is clearly consistent with the interests of national security"—

and stresses that "*arbitrary and perfunctory* decisions must be avoided." *Id.* (emphasis added). The Regulation also requires the Army to "determine whether suspension of access is *reasonable and warranted*" and to conduct an inquiry or investigation in order to "provide a *sound basis for revocation* of the individual's security clearance." *Id.* ¶ 3–1b (emphasis added). Thus, in order to deny a person access to classified defense information, there must be some evidence that the factors relied upon by the Army bear a rational connection to the interests of national security, specifically the individual's ability to safeguard the type of information to which he has been denied access. Anything short of this requirement would be "arbitrary and perfunctory" and in derogation of the overall decisional scheme established by the Regulation.[11]

### D. *The Role of Hearsay Evidence*

■ Because the Army built its case almost entirely on hearsay evidence, it is appropriate to review the principles governing the use of such evidence in administrative proceedings. Provided it is relevant and material, hearsay is admissible in administrative proceedings generally and in adverse action proceedings in particular. *E.g., Johnson v. United States*, 628 F.2d 187, 190 (D.C.Cir.1980); *Diggin v. United States*, 661 F.2d 174, 178 (Ct.Cl.1981).[12] Moreover, under certain circumstances, hearsay can constitute substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *accord, Johnson v. United States*, 628 F.2d at 190–91 (hearsay may be substantial evidence depending on its truthfulness, reason-

---

11. The Government does not contend that there is no nexus requirement for security clearance revocations under this Regulation. Consequently, we do not address the constitutional questions that would be presented by a regulation allowing denial or revocation of security clearances on grounds unrelated to an individual's ability to safeguard classified information. *See Mindel v. United States Civil Serv. Comm'n*, 312 F.Supp. 485, 488 (N.D.Cal. 1970) ("The government's argument that the [Civil Service Commission's] regulations do not require a showing of rational nexus is unconvincing, as such a reading would render them

constitutionally suspect on due process grounds"); *cf. Community for Creative Non-Violence v. Watt*, 670 F.2d 1213, 1216 (D.C.Cir. 1982) (per curiam) ("a court will not pass upon the constitutionality of a statute or a regulation if a construction is fairly possible by which the question may be avoided").

12. The Administrative Procedure Act, 5 U.S.C. § 556(d) (1976), and the MSPB's regulations, 5 C.F.R. § 1201.62(a) (1981), both provide for the exclusion of evidence only if it is "irrelevant, immaterial or unduly repetitious."

ableness and credibility; hearsay statements are highly probative where declarants are disinterested witnesses, statements are essentially consistent, and counsel had access to the statements prior to agency hearing); *Calhoun v. Bailar,* 626 F.2d 145, 149 (9th Cir. 1980) (hearsay may constitute substantial evidence depending upon its probative value and reliability, considering, *inter alia,* possible bias of the declarant, whether statements are signed and sworn to, whether they are contradicted by direct testimony, whether the declarant is available, and whether the hearsay is corroborated), *cert. denied,* 452 U.S. 906 (1981); *Schaefer v. United States,* 633 F.2d 945, 952–53 (Ct.Cl.1980); *see generally* 4 B. Mezines, J. Stein & J. Gruff, Administrative Law § 26.02 (1981). However, as the MSPB noted in this case, "mere hearsay lacking sufficient assurance of its truthfulness is not substantial evidence to overcome the sworn testimony of a claimant." *McKee v. United States,* 500 F.2d 525, 528 (Ct.Cl.1974).

### III. REVIEW OF THE MSPB DECISION

As noted above, the legality of petitioner's dismissal is not an independent issue on appeal. Rather, both sides agree that the legality of his dismissal depends entirely upon the legality of his security clearance revocation. We, of course, must affirm the decision of the MSPB upholding the security clearance revocation if it is supported by substantial evidence and is not arbitrary or capricious or otherwise not in accordance with law. 5 U.S.C. § 7703(c) (Supp. IV 1980). With these standards in mind, and considering in particular the Regulation at issue and the nature of the hearsay evidence in the record, we review in turn the charges which formed the basis of the Army's revocation decision.

#### A. *The Alleged Security Violations*

In defending before the MSPB its decision to revoke petitioner's security clearance, the Army relied upon three alleged security violations by petitioner: (1) allowing an unauthorized individual access to an operational Army vehicle; (2) allowing a typewriter repairman access to a secure area; and (3) posting classified information in an unauthorized area. Lt. Colonel Koslosky explained that these constituted a "[w]illful violation or disregard of security regulations," which is one of the possible bases for revoking a security clearance under the Army Regulation. AR 604–5, ¶ 3–1 a (14) (May 4, 1972); Tr. 105. Clearly there is a strong nexus between the willful violation or disregard of security regulations and one's ability to safeguard information. Understandably, then, these alleged security violations formed an important part of the Army's case. Indeed, Lt. Colonel Koslosky testified that, of the three bases for revoking petitioner's clearance—the psychiatric evaluation, the security violations and the incidents of alleged sexual misconduct—the security violations were "probably most important[ ]." Tr. 10. He added that even one of the three violations would have justified submitting a letter of intent to revoke petitioner's clearance. Tr. 13.

The evidence presented by the Army on these alleged violations, however, was not commensurate with the importance it attached to them. The Army presented no direct evidence of any of the alleged violations. Rather, in each instance, the allegations were based entirely upon the hearsay statements of one of Hoska's co-workers in Berlin, David Hiley. Tr. 80. When asked by this court on appeal why the Army had not produced Hiley to testify at the MSPB hearing, Government counsel responded that Hiley had left the Army and his whereabouts were unknown. The Army also failed to produce the investigator who took Hiley's statements or to introduce any evidence corroborating Hiley's accounts or demonstrating their reliability. Moreover, the testimony offered by petitioner cast at least some doubt upon the veracity and reliability of the hearsay statements made by Hiley.[13]

---

13. Petitioner testified that he and Hiley had shared an office and that Hiley's performance

was unfavorably compared to his own because Hiley's inability to "learn the German language

The Army not only failed to produce direct evidence, or reliable hearsay evidence, to prove the allegations in Hiley's statements; as discussed below, it also failed to demonstrate that the incidents constituted security violations.

■ *The Car Washing Incident.* The Army charged that petitioner had permitted an unauthorized individual access to an operational vehicle. Petitioner acknowledged that he had allowed his neighbor's son to wash an operational vehicle, but denied that this constituted a security violation. Tr. 68–69. The evidence presented by the Army to prove that the incident did constitute a security violation was wholly inadequate. Peter Nelson, the Army officer who reviewed the initial decision to revoke petitioner's clearance, described an "operational vehicle" as "one that is usuall [sic] of a civilian nature, with civilian plates, and would not have any exterior markings associating it with a [sic] the U.S. Army or a particular intelligence organization." Tr. 50. He testified that he was not aware of any regulation forbidding the type of access to an operational vehicle permitted by petitioner, but stated that he thought such a regulation would "be a reasonable [one] that most intelligence units would apply." Tr. 50–51. The Army offered no other testimony to prove that petitioner's conduct violated any security regulations or standard security practices.

Petitioner, on the other hand, testified that the German nationals in the motor pool, who were employed to service Army vehicles, were never "cleared" before being allowed access to operational (as opposed to "covert") vehicles. Tr. 69. Petitioner also testified that there was no standard procedure or regulation either permitting or forbidding what he had done. Tr. 78–79. Charles Rubacky, petitioner's security manager, testified that allowing a neighbor to wash an operational vehicle, as petitioner had done, did not constitute a breach of security. Tr. 136.

Clearly, petitioner's conduct cannot, on the basis of the evidence offered, be characterized as a "[w]illful violation or disregard of security regulations," the language of the Regulation invoked by the Army. AR 604–5, ¶ 3–1a (14).

■ *The Typewriter Repair Incident.* The Army also alleged that petitioner had committed a security breach by allowing an unauthorized typewriter repairman access to a secure area, *i.e.*, petitioner's workplace. Again, petitioner admitted that he had allowed a typewriter repairman into his office but testified that he had done so in accordance with standard procedures and only after taking all necessary precautions. Tr. 70–72, 79–80. He had escorted the repairman into the office, cleared the area of classified information, and ensured that the person's presence would not interrupt any work in progress. Tr. 70–71. Mr. Rubacky also testified that petitioner's conduct was in accordance with proper procedures and did not constitute a security violation. Tr. 136, 140. The Army's witness, Lt. Colonel Koslosky, did not know whether any security regulations specifically applied to this alleged security violation. Tr. 109. Indeed, he acknowledged that "[i]f the individual [the repairman] is escorted . . . and precautions are taken, then that is according to the units [sic] procedures, then that is an acceptable procedure. . . ." Tr. 29. He also admitted that his "overriding recollection [was] that there was a breach here because Mr. [David] Hiley testified there was a breach." Tr. 29–30. In short, the evidence presented does not support the conclusion that petitioner's conduct violated any security regulations.

■ *The Alleged Posting of Classified Information.* The Army alleged that petitioner breached security by posting classified information on an acetate overlay of a map in an unauthorized area. Petitioner admitted posting information concerning "restricted areas" in Poland on the map, Tr. 73,

that he needed to do his job . . . [made Hiley's] position increasing[ly] difficult to maintain." Tr. 82. Charles Rubacky, a witness for peti-

tioner, testified that the relationship between Hoska and Hiley was "distant." Tr. 137.

but denied that the information was classified or that it was taken from a classified source. Rather, he testified that he had taken the information from a German newspaper. Tr. 79, 94. Charles Rubacky testified that posting information obtained from a newspaper, as petitioner claimed he did, would not constitute a security breach. Tr. 138. Although the Army maintained that petitioner had improperly posted classified information, Lt. Colonel Koslosky testified that the Army's only basis for concluding that the information posted by petitioner was classified was the statement in that effect by David Hiley. Tr. 30.[14] On this critical question, therefore, the Army presented only the hearsay statement of David Hiley to counter petitioner's sworn testimony to contrary. Consequently, the record does not support the Army's allegation that petitioner "willfully violated or disregarded security regulations."

In short, under any standard of proof, the evidence in the record could not support a conclusion that any of the three alleged security breaches constituted, in the applicable language of the Army Regulation, a "willful violation or disregard of security regulations." The Army offered only the unsubstantiated hearsay statements of one of petitioner's co-workers, whose motivation was questioned by the evidence submitted by petitioner, to counter the testimony of both petitioner and Mr. Rubacky that petitioner had committed no breaches of security. Moreover, the Regulation invoked by the Army states that the various factors listed, including willful disregard or violation of security regulations, "*may, depending upon the degree of seriousness*, be the basis for . . . revocation of clearance." AR

604–5, ¶ 3–1. The Army was unable to prove the petitioner violated any security regulation, much less that the violation was *willful*, and even less that the violation was *serious* enough to warrant revocation of his clearance.[15] Thus, the alleged security violations themselves do not constitute substantial evidence supporting the Army's decision to revoke petitioner's clearance, nor can they contribute to any measurable extent to a finding of substantial evidence.

### B. The Psychiatric Evaluation

 The Army's concern about petitioner's mental stability was based on petitioner's psychiatric examination and evaluation in Frankfurt, West Germany. That evaluation, a four-page handwritten letter, concludes that petitioner has an "obsessive-compulsive neurosis." App. 30–33. The evaluation provides no explanation of the term "obsessive-compulsive neurosis," and the vague, tentative and conclusory statements that comprise the rest of the evaluation provide no guidance as to the practical significance of that diagnosis. The evaluation states, for example, that Hoska "was tense and guarded, though he attempted to be open, friendly, and cooperative." App. 31. Similarly, the psychiatrist states in the evaluation that he "had the sensation that somehow [Hoska] did not quite understand the reality of our interview together so that his behavior seemed the slightest bit inappropriate. My surmise is that this is a constant characteristic of his interpersonal relations." *Id.* The report concludes that

> Mr. Hoska appears to be a person whose personality is grossly intact and appears to be, on the surface, convential [sic], but who is somewhat out of touch with pow-

---

**14.** In response to a request by the MSPB presiding official for more information on this issue, the Army submitted a post-hearing memorandum to the MSPB, in which it explained that under Army regulations, "information extracted from a classified document is derivatively classified," App. 66, and that the "appearance in the public domain of information currently classified does not preclude continued classification." App. 67. That memorandum, however, also relied exclusively on the statement of Mr. Hiley to demonstrate that the posted infor-

mation in fact came from a classified source. App. 65. It offered no *evidence* that petitioner took the information from a classified source or that the newspaper in which petitioner, according to his testimony, found the information had obtained it from a classified source.

**15.** It is equally clear that the evidence of the alleged security violations does not show that petitioner committed "[a]cts of a reckless, irresponsible or wanton nature . . . ." AR 604–5, ¶ 3–1*a* (18).

erful motivating feelings within himself and not quite "in tune" to the feelings and thoughts of others in his environment. This situation would make it almost inevitable that he would frequently become involved in misunderstanding [sic] with others and seem to do inappropriate things.

*Id.* at 32. No psychiatrist or psychologist testified at the hearing to explain the significance of the evaluation. Nor did the Army offer any evidence to indicate that the psychiatrist's hearsay evaluation was credible or reliable. It offered no evidence of the psychiatrist's qualifications or of the nature of the examination he conducted. Indeed, Lt. Colonel Koslosky testified that he knew nothing about the qualifications of the psychiatrist or the conditions under which the examination took place. Tr. 15–16.

Moreover, petitioner's testimony about the circumstances surrounding the psychiatric examination—the only such testimony—cast serious doubt upon the resulting evaluation. Petitioner explained that he was ordered, with little explanation, to go to Frankfurt for a psychiatric examination because questions about his stability had been raised. He was told that a brain scan and some other tests might be involved. He testified that he was perplexed as to why he was required to take an eleven-hour train ride to Frankfurt when he was stationed in Berlin. Petitioner explained that, under the circumstances, he was concerned that he might have been set up, that the examination might have been a "put-up job." Indeed, upon arrival for the examination, the doctor told him that he had no knowledge of petitioner's case and that petitioner's appointment had been made under a fictitious name. Tr. 89–90. Certainly the circumstances described by petitioner at least suggest a rational explanation of why he might have appeared "tense and guarded" or why the psychiatrist "had the sensation that somehow [Hoska] did not quite understand the reality of [the] interview . . . ."

The Army acknowledged that the psychiatric evaluation alone could not justify the revocation of petitioner's security clearance. Tr. 99, 125. It is clear from the record, however, that, even in conjunction with other evidence, the psychiatric evaluation could not provide that additional amount of evidence that would justify a conclusion that there was "substantial evidence" in the record supporting the Army's decision. As noted above, the Army offered no evidence to bolster the ambiguous and entirely unsubstantiated hearsay conclusions in the evaluation, nor did it offer evidence to explain how the evaluation demonstrated a "significant defect in the judgment or reliability of" petitioner. AR 604–5, ¶ 3–1a (20). Moreover, although in some circumstances evidence of psychological problems surely might provide a rational nexus to an individual's ability to safeguard classified information, the psychiatric evaluation in this case clearly did not. The Army simply did not demonstrate how, as a practical matter, the evaluation indicated that petitioner was unable to protect the classified information to which he was entrusted. Finally, the testimony of Lt. Colonel Koslosky indicated that the Army failed to comply with its Regulation, which states that security clearance determinations must be "based upon all available information, both favorable and unfavorable." *Id.* ¶ 3–1a. Koslosky testified that, in deciding whether to revoke petitioner's clearance, no consideration was given to petitioner's medical records and career appraisals, all of which apparently concluded that he was mentally fit and stable. *See* Tr. 17–25.

### C. *Alleged Sexual Misconduct and Incidents of Indiscreet Behavior*

The Army also relied upon evidence of incidents allegedly involving sexual misconduct or other indiscreet behavior by petitioner, which it viewed as "immoral or notoriously disgraceful conduct" under the Regulation, AR 604–5, ¶ 3–1a (17). *See* Tr. 111–12. In particular, much of the testimony focused upon several events that occurred while petitioner and his wife were acting as advisers on a girl scout trip through Germany. Having reviewed the testimony concerning all of these incidents,

we conclude that it too is inadequate, even in conjunction with the other evidence presented by the Army, to support the MSPB's decision.

### 1. *Evaluation of the Evidence*

█ One of the central weaknesses in this portion of the Army's case, as in the rest of the Army's presentation, is that the allegations of misconduct were based entirely on hearsay evidence.[16] Many of these allegations were vitiated by the sworn testimony of petitioner and his wife describing the circumstances of the incidents involved. Thus, although the Army has maintained its position that *all* of the incidents of allegedly improper behavior together comprise a legitimate basis for revoking petitioner's clearance, the evidence shows that many of the incidents, as explained by petitioner, are so far removed from anything "immoral or notoriously disgraceful" as to be of no assistance to the Army. For example, the Army argued that petitioner had purchased beer for a minor girl scout in a restaurant during their trip through Germany. Petitioner acknowledged having purchased beer for the girl scout, Tr. 72, but explained that it was reasonable to permit the girl to sample a beer (she in fact took only one sip) because it was in a controlled environment in which he and his wife were present, it was not contrary to any local law or custom, and "[t]he restaurant was full of young people of similar age ... many of

whom were drinking beer." Tr. 82–83. Petitioner's wife recited the same account of the incident, emphasizing that allowing the girl to sample beer was not "unnatural because in the surroundings there were young people drinking beer." Tr. 130. Similarly, the Army's bald and, given the evidence, misleading allegation that petitioner displayed pictures of nude females to girl scouts during the same trip was totally defused by petitioner's explanation of the incident.[17] Since the Army did not offer testimony disputing petitioner's accounts of either of these two incidents, it is clear that this evidence does not demonstrate "immoral or notoriously disgraceful conduct" or otherwise provide a legitimate basis under the Army's Regulation for revoking petitioner's clearance.[18]

Other allegations by the Army arguably demonstrate indiscretion by petitioner. For example, the Army appears to rely particularly heavily on a single incident in which petitioner admittedly recited an off-color rhyme in the presence of girl scouts. Merely showing indiscretion by petitioner, however, is inadequate under the Army's own Regulation to support the revocation of petitioner's clearance. Even if an incident such as this one could rationally be viewed as involving "immoral or notoriously disgraceful conduct," it is not clear from the Army's evidence that it is of a serious enough degree—an inquiry mandated by

---

**16.** The Army did not give petitioner or his counsel the names of the individuals who provided information on these incidents. Tr. 32. Nonetheless, petitioner did present evidence questioning the motivation of the girl scouts who had provided information to the Army. Specifically, he offered evidence suggesting that the girl scouts might have been angry with him because he had disciplined them for misbehaving and had reported their improper behavior to their parents. Tr. 86, 131; App. 61.

**17.** Petitioner testified that he had purchased, not a pornographic magazine, but a copy of a German "trade journal for the swimming pool and sauna industry" that had advertisements containing some nudity. He denied having made the magazine available to the girl scouts or otherwise having displayed nude pictures to them. Rather, one of the girl scouts "yanked"

the magazine from him and "leafed through it," at which point petitioner understandably felt that it would have been improper for him to "yank it back and have a fight over possession of the magazine." Tr. 77.

**18.** Similarly, petitioner admitted that, while attending the Defense Language Institute in Monterey, California before being stationed in Berlin, he sunbathed in his jockey shorts on a deserted beach with three consenting adult companions, one of whom was his wife. Tr. 67–68, 88, 132. Again, to view the evidence concerning this incident, even in conjunction with the Army's other evidence, as sufficient to establish immoral or notoriously disgraceful conduct serious enough to justify revocation of petitioner's clearance would be to rob the standards in the Army's Regulation of all meaning.

the Army Regulation—to justify revocation of petitioner's security clearance.[19]

The critical weakness in this portion of the Army's case, however, is its failure to demonstrate a rational nexus between petitioner's allegedly immoral and notoriously disgraceful conduct and his ability to protect classified information. The MSPB decision in fact contains no discussion at all of whether such a nexus exists.[20]

### 2. *The Proper Application of the "Rational Nexus" Test*

█ The Army's presentation before the MSPB did include general allegations of a rational nexus based upon all of the evidence against petitioner. In explaining their decision to revoke petitioner's clearance, the Army officers who testified invoked certain talismanic phrases—lack of reliability, instability, lack of judgment, indiscretion—that at least suggest a nexus to petitioner's ability to safeguard classified

information. *See* Tr. 45–47, 56–57, 99–100.[21] We do not mean to condone any of petitioner's off-the-job behavior, or to suggest that it involved no indiscretion at all. Nor do we suggest that demonstrations of poor judgment or indiscretion can never constitute a sufficient showing of nexus. For several reasons, however, we believe the circumstances of this case demand a more concrete showing of a rational nexus between the various allegations of misconduct and indiscretion and petitioner's ability to safeguard sensitive information.

First, none of the incidents of allegedly improper behavior involved classified or sensitive information or the protection of such information. Second, none of the incidents in any way concerned the Army or the work petitioner performed in the Army. Nor were these the type of incidents that, by their very nature, had some obvious bearing on petitioner's ability to do his job and to safeguard sensitive information.[22]

---

**19.** In addition, the Regulation specifically requires that

[i]n evaluating information of a suitability nature, consideration should be given to the gravity of the information in derogation, the age of the individual at the time the incident occurred, and his subsequent behavior and performance of duty.... Any determination involving such information must be tempered by an appreciation of all the facts bearing on the case.

AR 604–5, ¶ 3–1*c.*

**20.** For example, in reviewing the record to determine whether there was adequate evidence to support the Army's decision, the MSPB simply stated that "the testimony of the appellant and one of appellant's witnesses confirms that the incident involving the girl scouts did in fact occur," App. 9, without even suggesting whether there was any rational connection between this incident and the Army's decision to revoke petitioner's security clearance.

**21.** Army witnesses also suggested, without any detailed explanation, that petitioner's improper behavior might render him subject to blackmail or coercion. *See* Tr. 11–12, 47, 115. Petitioner did not, however, deny or attempt to cover up any of the incidents. Nor did the Army demonstrate that he found the incidents embarrassing or humiliating. Many took place in the presence of his wife. He discussed all of them, and indeed maintained the general position that the incidents did not involve impropriety. The mere allegation that petitioner might be subject

to blackmail or coercion, in these circumstances, is not an adequate demonstration of a rational nexus. *See Wentworth v. Laird*, 348 F.Supp. 1153, 1155–56 (D.D.C.1972) (no rational connection between employee's homosexual activity and revocation of his security clearance on ground that such activity renders him a likely subject of coercion where he has not hidden his homosexuality and has never violated any security regulations), *aff'd sub nom. Gayer v. Schlesinger*, 490 F.2d 740 (D.C.Cir. 1973).

**22.** In employee discharge cases, courts have indicated that the required nexus between discharging the employee and promoting "the efficiency of the service" may be greater where the discharge is based upon conduct that is not work-related. *See, e.g., Bonet v. United States Postal Serv.*, 661 F.2d 1071, 1078 (5th Cir. 1981) ("when the employee misconduct is off-duty and non-work related ... the courts have been generally unwilling to presume that the discharge will promote the efficiency of the service"); *Phillips v. Bergland*, 586 F.2d 1007, 1011 (4th Cir. 1978) (courts have recognized the distinction between work-related misconduct and "misconduct which is entirely unrelated to the employee's work and which occurs when the employee is off duty" and "have made plain the greater burden which rests on the agency to justify its action in the latter case"). In addition, under 5 U.S.C. § 2302(b)(10) (Supp. IV 1980), it is a "prohibited personnel practice" to discriminate in a per-

Third, the other evidence in this case that *was* explicitly work-related—such as petitioner's work evaluations and career appraisals, which the Army apparently never considered in deciding whether to revoke petitioner's clearance—contains no negative appraisals concerning petitioner's judgment, reliability or stability. On the contrary, they show that petitioner had performed stably and admirably in his position. *See* Tr. 23–25, 57–59; App. 49–54, 63; note 1 *supra.* (Furthermore, as shown above, the claims regarding the alleged on-the-job security violations are at best unfounded allegations and at worst patently frivolous charges.) Fourth, the Army does not contend that any of the incidents of improper behavior involved a violation of any law, local custom or Army regulation.

Finally, the rational nexus requirement is perhaps nowhere more important than where an adverse action is taken against an individual on the basis of lawful, consensual, social behavior that is considered by his superiors to be "immoral" or "notoriously disgraceful." Without the limitations provided by the nexus requirement, such a standard would give the Army virtually free reign to purge itself of persons found to be distasteful under the sacrosanct guise of protecting the national security. As this court noted in *Norton v. Macy,* 417 F.2d 1161 (D.C.Cir.1969): "A pronouncement of 'immorality' tends to discourage careful analysis because it unavoidably connotes a violation of divine, Olympian, or otherwise universal standards of rectitude." *Id.* at 1165. True to that maxim, the Army in this case has invoked standards of morality in depriving petitioner of his security clearance and his job, but has failed to provide any "careful analysis" of the connection

between the incidents of allegedly immoral or improper behavior and petitioner's ability to execute the responsibilities associated with his Top Secret clearance.

Thus, under the circumstances of this case, in order to rely on its evidence of improper or indiscreet behavior in revoking petitioner's security clearance, the Army was required to show some specific connection between that evidence and petitioner's ability to safeguard the information to which the security clearance gave him access. This is not an onerous requirement. It merely compels the Army to comply with the standards of reasonableness and nonarbitrariness in its own Regulation. Because the Army has plainly failed to satisfy these standards, the adverse actions taken against Hoska cannot stand.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the record does not contain substantial evidence supporting the MSPB conclusion that the Army's revocation of petitioner's security clearance (and subsequent dismissal of petitioner) was lawful.[23] Consequently, we hereby set aside the decision of the MSPB and remand this case with instructions to the MSPB to order appropriate relief, including reissuance of petitioner's security clearance, reinstatement, back pay, and such other relief as may be warranted.

*So ordered.*

sonnel action against any employee "on the basis of conduct which does not adversely affect the performance of the employee ... or the performance of others...."

**23.** As is clear from our opinion, the Army's revocation of petitioner's clearance was not in

accordance with the requirements of its own Regulation, specifically its inherent nexus requirement. Thus, the Army's action was unlawful, and the MSPB was prohibited by statute from upholding it. 5 U.S.C. § 7701(c)(2)(C) (Supp. IV 1980).